UNION LEAGUE CLUB OF CHICAGO v.
UNITED STATES.

No. M–123.

Court of Claims.

Nov. 6, 1933.

This case having been heard by the Court of Claims, the court, upon the evidence adduced, makes the following special findings of fact:

I. The plaintiff is a corporation not for pecuniary profit, and the objects for which it was incorporated are set forth in its certificate of incorporation as follows: "The object for which it is formed is to encourage and promote, by moral, social, and political influences, unconditional loyalty to the Federal Government, and to defend and protect the integrity and perpetuity of this Nation, and to inculcate a higher appreciation of the value and sacred obligations of American citizenship; to maintain the civil and political equality of all citizens in every section of our common country, and to aid in the enforcement of all laws enacted to preserve the purity of the ballot box; and to resist and expose corruption and promote economy in office, and to secure honesty and efficiency in the administration of National, State, and municipal affairs."

II. Under section 501 of the Revenue Acts of 1924 and 1926 (26 USCA § 872 note), respectively, plaintiff collected from its various members amounts equal to 10 per cent. of their initiation fees and membership dues, and periodically during the period from August 26, 1924, to and including July 23, 1928, paid the amount so collected, a total of $178,-916.24, to the collector of internal revenue for the First district of Illinois, at Chicago, Ill. The dates and amounts of such payments are as stated in plaintiff's petition.

III. On August 3, 1928, plaintiff duly

filed with the collector of internal revenue for the First district of Illinois, at Chicago, Ill., a claim for the refund of said $178,916.24 so paid as aforesaid by plaintiff as taxes on dues and initiation fees collected by it from its members. The basis set forth in said claim for refund was that plaintiff was not a social, athletic, or sporting club or organization within the meaning of section 501 of the revenue acts of 1924 and 1926. This claim for refund was rejected in full.

IV. History of Organization.—Plaintiff was organized as "The Chicago Club of the Union League of America," on the principles of the Union League of America, a patriotic organization founded during the Civil War, with the object of combating treason and rebellion, of preserving the Union in its territorial integrity, of maintaining the laws and keeping inviolate the principles of the Constitution and the Declaration of Independence. Its name was later changed in 1882 to the "Union League Club of Chicago."

On January 4, 1881, a year after its organization, plaintiff, at a meeting of its members, adopted the following articles of association:

"The condition of membership shall be absolute and unqualified loyalty to the Government of the United States.

"The primary objects of this association shall be—

"1st. To encourage and promote by moral, social, and political influence unconditioned loyalty to the Federal Government and to defend and protect the integrity and perpetuity of this Nation.

"2nd. To inculcate a higher appreciation of the value and sacred obligations of American citizenship; to maintain the civil and political equality of all citizens in every section of our common country and to aid in the enforcement of all laws enacted to preserve the purity of the ballot box.

"3rd. To resist and oppose corruption and promote economy in office, and to secure honesty and efficiency in the administration of national, State, and municipal affairs."

These articles of association are printed and appear in each of the year books which the club has issued since its organization down to the present time, except in the years 1891 and 1892, under the heading "Condition of Membership and Primary Corporate Objects."

From the beginning the by-laws of the club provided for a committee on political action to suggest or recommend to the club any special political action or conduct which to their mind seemed advisable, consistent with the objects set forth in the articles of association of the club, which by-laws were modified in 1893 to provide for appointment by the committee on political action of three subcommittees of its membership, one on municipal affairs, one on county affairs, and one on state affairs, and requiring the committee to submit written reports at the annual meeting of the club. At the same time the by-laws were further modified to require the board of managers annually to appropriate 3 per cent. of the amount received from annual dues "to be expended in promoting the objects of this club as set forth in the articles of association"; said amount to be expended by the committee on political action. This committee continued actively in existence until the year 1919, when it was superseded by the "Public Affairs Committee" consisting of fifteen members, whose duties are those defined in the by-laws of the club to be as follows:

"Section 2. It shall be the duty of the committee to promote the primary objects of the club as stated in the club's articles of association; to arrange for discussions on questions of public interest, to endeavor to contribute to the solution of such questions, particularly by educational means, and to have general charge of the relations of the club to public affairs, to civic activities, and to other clubs and organizations.

"The committee shall have charge of exercises held by the club on February 22nd in each year in honor of the birthday of Washington.

"Section 4. The public affairs committee shall, at the annual meeting, submit a written report."

The public affairs committee is still an active committee of the club with duties substantially as set forth in the by-laws adopted in 1919.

The civic and patriotic purposes named as the sole corporate object of the club have never been lost sight of by the officers or members of the club, but have been kept continuously in the forefront of the activities of the club and spread before its membership since its beginning. They have frequently been referred to in the annual reports of the club to its membership.

Immediately upon its organization the plaintiff started upon a program of discussions of public questions before meetings of its members, which has continued to the pres-

ent day. The list of subjects thus discussed, and to a large extent debated by the membership, covers practically the entire range of problems of a civic and political character currently before the local, state, and national authorities. The preservation of the purity of the ballot box, one of the stated objects of the club, was before the membership for consideration twenty-five times. On ten occasions civil service laws applicable to the city of Chicago and state of Illinois and having to do with economy in office and efficiency in administration of public affairs, another stated purpose of the club, were debated and acted upon through active participation of the plaintiff in their ultimate enactment. International relations having to do with the perpetuity of the nation were considered at thirteen different membership meetings. Other matters dealt with at meetings were the draft, the establishment of better cantonments, the duties of citizenship, changes in the judicial system, proposed state and national legislation, bankruptcy, immigration, public franchises, local option, and other phases of the liquor question, the Army and Navy, taxation, education, law enforcement, smoke abatement, sanitary district of Chicago, the use of streets and alleys, arbitration in strikes, railroads, juvenile delinquency, forestry, the post office, the income tax, public bond issues, antitrust laws, initiative, referendum, and recall, government of the Panama Canal Zone, constitutional amendments, state police, zoning, and the national budget.

Money was frequently voted by the club to committees of its own and other organizations to be expended in promoting the accomplishment of the public objects thus under consideration.

V. Washington's Birthday Celebrations.—Since 1887 plaintiff has conducted annual public celebrations in honor of Washington's birthday; and during recent years has conducted similar celebrations in honor of Lincoln's birthday. These celebrations were originally twofold in character, consisting, on the one hand, of a public meeting in the largest available audience hall in Chicago, where prominent speakers, drawn from various parts of the United States, addressed the meeting on subjects connected with the life and character of George Washington or some prominent civic or patriotic topic of the day; and, on the other hand, of a dinner for club members at the clubhouse where the speaker of the day at the auditorium and other invited guests, usually of national prominence, spoke upon subjects appropriate to the occasion. Later,

in 1923, a third feature, which soon became the most prominent feature of the day's celebration, was added to the program, namely, the gathering together of public-school children throughout the city, first in their own school buildings, and later in large downtown auditoriums, either the auditorium itself or Medinah Temple, where programs of patriotic addresses, songs, school band music, pageants, and orations by high school students, selected through competitive preliminary contests throughout the city, were carried out. These meetings had the active co-operation of the school authorities of Chicago and were participated in by many thousands of the school children annually. The meetings in the school buildings were addressed by speakers drawn from the membership of the Union League Club, while the downtown meetings in the auditoriums were presided over by club officials. The purpose of these meetings, as stated by the witness, Mr. Kelly, who, as chairman of the public affairs committee and president of the Union League Club, participated in many of them, was "to bring to public attention the problems of the day affecting the Government and illustrating the importance of good citizenship."

A number of prominent Americans were speakers at the public gatherings in the auditorium and a very large number of high school students participated in the exercises.

VI. War Activities.—April 22, 1898, at a special meeting of the club's membership, called for that purpose, a resolution was adopted endorsing the action of the United States and Congress in their declaration of war upon Spain and tendering the services of the club to that end, and an executive committee was appointed to devise means for assisting the government in the crisis. At its quarterly meeting, October 11, 1898, the plaintiff received a report from the war committee previously appointed and discussed the subject of "Achievements and Lessons of the War."

On March 28, 1916, at the annual meeting of the members of the Union League Club, the subject of "Preparedness" was discussed and a resolution then presented by the political action committee adopted, calling upon the Congress of the United States and executive authorities to take effective measures to provide adequate means for national defense, and pledging the club to devote its energies during the coming year to analysis, discussion, and understanding of three problems then confronting the nation:

1. Its foreign policy.

2. Its military and naval establishment.

3. The best method of equipping the citizens for military service.

On May 9, 1916, the members of the club at their regular quarterly meeting listened to addresses on the subject of the "Interests of America and the Issues of the European War," and on June 1, 1916, listened to another address upon the same general subject. On June 27, 1916, the members of the club, at a special meeting, adopted resolutions suspending the dues of all members of the club entering military and naval service of the United States while absent from Chicago, pledging the support of the club to the government in the existing military situation, and directing the board of managers to take steps to raise for the care of families of men in military and naval service of the United States and for medical and other care of the men, from gifts of members, a patriotic fund in the amount of $100,000, during the year. On November 14, 1916, the members of the club, in their quarterly meeting, listened to the first of a series of addresses on topics of national interest arranged by the committee on political action, the subject being the "Monroe Doctrine and National Defense." On March 27, 1917, the club, at its annual meeting, adopted resolutions on preparedness offered by the political action committee, recording the club's support of the President of the United States in severing diplomatic relations with Germany, calling upon Congress to give to the President the fullest support, putting itself on record as favoring the principles of universal military service in the present emergency, and calling upon Congress to provide by law for universal and compulsory military training and service and to enact all necessary laws to the end that the United States might prepare in the fullest measure to uphold the integrity and honor of the country.

When war was declared upon Germany, a committee on national defense known as the "War Committee" was appointed, which appointed a number of subcommittees and held more than 175 meetings. Among other things, the committee endeavored to reach Germans and people of German extraction through loyalty editorials in the German Language Press in Chicago. It had nearly a half million copies of pamphlets printed and circulated which pertained to the duty of individuals with a view to winning the war, and over 30,000,000 copies of an article entitled "Why We Fight" were distributed largely through the newspapers. Other articles and pamphlets supporting the war on the part of this country were distributed in corresponding numbers, and the war committee participated actively in all movements and drives for Liberty loans and for the raising of money for the Red Cross, Y. M. C. A., and similar organizations. In its own work it raised and distributed over $69,000.

VII. On March 25, 1919, a public affairs committee was created to take over the work of two committees of the club theretofore existing, viz., the committee on political action and the war committee. The duties of this committee, as defined in the by-laws, have heretofore been recited under the heading of "History of Organization." To defray the expenses of the work of this committee the by-laws further provided that "each year there shall be paid over to the committee three percent of the amount received from the annual dues of members." Among other things, the committee investigated and considered practically every item of public legislation and executive activity in Chicago and in the state that came to have significance generally among the people. This included bills before the Legislature on the subjects of taxation, jury duty, organization of courts and court procedure, and bills before the city council on ordinances of various types, executive action by the mayor or Governor on the administration of public affairs, and things of that sort. It took over and enlarged the work of the political action committee, had fifteen members, has held meetings on Monday of every week since its organization, except in July and August of each year, and has a great many subcommittees having charge of the following subjects: Administration of justice, boys' court, city planning and zoning, conservation of natural resources, editorial committee of the Union League Club Bulletin, education, elections, military and naval affairs, public efficiency, public health, race relations and housing, taxation and public finance, and Washington's birthday celebration.

Many members of the club in addition to the members of the committee are enlisted by these subcommittees in civic activities. In the club year 1920 and since, this committee and its subcommittees took part in a large number of activities designed to improve civic and social conditions in the city of Chicago and the state of Illinois. Among the most important activities in this direction was the incorporation of the Union League Foundation for Boys' Clubs designed to promote the social, moral, and physical education and development of underprivileged boys in Chicago. The by-laws of the foundation provide that

the trustees of the corporation shall always be members of the Union League Club of Chicago, and its headquarters have always been maintained in the clubhouse of the Union League. The foundation established and directed buildings and boys' camps through contributions by club members. Altogether the club and its members have contributed to this foundation work since it was organized a total of over $608,000. The police records show a large reduction in juvenile delinquency in the neighborhoods where these boys' clubs were established.

VIII. Club Membership.—Plaintiff at its organization consisted of sixteen members. From that number it increased in the succeeding years, with occasional periods of recession in numbers, its membership during the four-year period now under consideration being as follows: Resident, nonresident, retired, veteran, honorary, and Army, Navy, clergy, and other memberships provided for in the by-laws.

All applicants for membership in the Union League Club during the period here involved, and prior thereto, were required to sign a printed application form, at the head of which appeared the motto of the Union League Club, viz.:

"Union League Club

"Chicago

"Welcome to Loyal Hearts

"We join ourselves to no party which does not carry the flag and keep step to the music of the Union."

Following this there appeared on the form the statement that, "The condition of membership shall be absolute and unqualified loyalty to the Government of the United States," and the primary objects of the association as set forth in its charter and articles of association were next quoted verbatim. Just above the applicant's signature appeared the following statement: "I hereby apply for resident membership in the Union League Club, of Chicago, and declare that I am a citizen of the United States and pledge myself to do all in my power to carry out the primary objects of the club, as quoted herein and as set forth in its articles of association."

About the time the present clubhouse was built and ready for occupancy, the membership committee made a special effort to secure the applications for membership in the club of representative citizens who were outstanding in their activities in civic, patriotic, and philanthropic enterprises by securing the names of such citizens from the board of directors and having prominent members of the club invite them into membership. The membership committee further in that connection sent out a notice to the sponsors of applicants for membership in the club stating that the board of managers was desirous of encouraging into membership men who stood for the high principles of the club's patriotic, civic, religious, and philanthropic activities, and requesting information as to the applicant's experience along these lines.

Unless applicants for membership measured up in the judgment of the committee to the standard set by the club's charter and articles of association in civic and patriotic matters, they were not considered eligible for membership. Men who merely passively existed as good citizens were not sought by the club as new members, but only those who would take an active part in its civic and patriotic purposes.

IX. Club Buildings.—Plaintiff has maintained a clubhouse in the city of Chicago at the southwest corner of Jackson boulevard and Fourth avenue (now Federal street) since 1885. The original building, erected at that time, continued without substantial modifications until 1916, though an eight-story fire-proof addition was added to it on the south end of the club's lot some years prior to that date. In 1916 some few improvements were added to the main building and a three-story addition was placed on the fireproof annex to the south, in which were installed an athletic department with a gymnasium and a swimming tank. Plaintiff's clubhouse continued in this form until 1923 or 1924, when it became necessary to tear down the entire building then existing and replace it with a new building, which was completed in 1926, and which the club has ever since occupied.

The present clubhouse is handsome in appearance and luxurious in its appointments. It is erected on a plot of ground extending 100 feet along Jackson boulevard and 150 feet along Federal street. The structure stands twenty-two stories high, with three stories below the street level. The exterior of the structure is of Indiana limestone up to the sixth floor and from that point up to the parapet it is of colonial red brick, stone-trimmed, including the cornice and parapet wall.

X. The following is a description of the interior of the structure, which for the sake of clearness is set forth according to floors:

The basement and subbasements are used in connection with the operation of the build-

ing. The first floor has two rooms which are leased for business purposes, also entrances and entrance lobbies, check rooms, and other rooms for the convenience of the members and guests. On the other floors are elaborate facilities for members and guests. For the benefit of the ladies there are two fine reception rooms, small rest rooms, and women's dining room with kitchen attached, also numerous accessories for their convenience, such as entrance and lobby with an exclusive passenger elevator, etc. Members have a grill room and kitchen, also a main dining room that will seat 511 people. There is a lounge and a main lounge and also what is called a banquet room, 20 feet wide and 70 feet long, with elaborate decorations. The floor of this room and of the women's dining room is of polished wood and the carpeting so arranged that it can be removed for dancing. There are also five private dining rooms, rooms and conveniences for the employees, office quarters, and the executive offices of the club. On the fourth floor is a library extending the full frontage on Jackson boulevard and 43 feet deep, a fourteen-table billiard room, card room, and assembly room, all expensively finished. On floors 10 to 17, inclusive, there are 212 sleeping rooms with a members' living room and lounge located on the seventeenth floor, so that those who occupy the rooms can meet their friends without going to the main lounge, or without taking them into their bedrooms. There are other sleeping rooms on other floors. There are four handball and squash racquet courts on the eighteenth floor. On the twentieth floor are locker rooms, a barber, chiropodist, bootblack, massage rooms, Turkish bath department, sun room, rest room, and base of swimming pool. The twenty-first floor is occupied by the gymnasium and exercise room, pool, dressing room, and physical director's office. The laundry and golf-practice room are located on the roof.

There were many reasons for building the present club building. The old building had become unsafe, not being fireproof and not being constructed to bear the floor loads caused by the number of people who congregated there. There was some discouragement with reference to the club's activities and its civic programs. The membership of the club was falling off and it was beginning to be known as an old man's club. A new building was desired for extension of facilities for carrying on its civic and patriotic purposes, and especially was it necessary to add conveniences and facilities that would attract younger men, such as the athletic department with gymnasium and swimming tank. Among those sought for membership in connection with the new clubhouse were men distinguished in public affairs, but athletic features were installed for the purpose of attracting and holding a desirable class of young men and were a success in this respect.

The athletic department of the club gives instruction in swimming and gymnasium work, and once a year handball, squash, and volley ball tournaments are held among the members of the club; also swimming-tank contests among such members go on throughout the year. The tank is not the regulation size for swimming contests. The club has no teams that represent it in competition with outside organizations and no such contests are held.

XI. Upon the erection of the new building, the membership of the club increased from 2,000 to 2,500 among the resident members and from 1,000 to 1,500 among the nonresident members, with a large waiting list.

During the years 1923 to 1928, the plaintiff extended the facilities of its clubhouse to various organizations, institutions, and associations which were philanthropic, civic, or educational in nature.

The old clubhouse was closed September 30, 1924, and temporary quarters occupied until about May 24, 1926. During the occupancy of the temporary quarters, no entertainments were planned or given.

XII. During the period from October 9, 1926, to February 23, 1929, the entertainment committee made arrangements for various activities, some of which were lectures of an educational nature, numerous motion pictures, some dinners, parties, and dances, some related to the gymnasium work and some musical programs; but none of these features had any connection with the predominant purpose of the club.

After plaintiff was established in its new clubhouse, the plaintiff's art, library, house, and reception committees which had been inactive while the temporary quarters were occupied again became active. Plaintiff's departmental income for the year ending February 28, 1925, was $469,512.43. From that time on it gradually rose until for the year ending February 29, 1928, its total income aggregated over $1,000,000, of which income from the restaurant was over half, room rental nearly $175,000, cigars and cigarettes about $120,000, athletic department nearly $54,000, barber shop a little over $30,000, card rooms and billiard room about $9,000. It ex-

pended considerable sums for the library maintenance, for the New Year's "open house," and a reception. There was $13,200 appropriated for the public affairs committee, and nearly $13,000 for entertainment committee expenses. The resident members of the club who subscribed to athletic privileges on an annual basis exceeded 20 per cent. of the entire resident membership, and there were an unusually large number of athletic events and contests during the year which aroused a great deal of interest. There was a large growth of patronage of the billiard room, and the card room was patronized by a great many members. Over $151,000 was received from members and paid out for tickets to various kinds of entertainment.

In the year ending February 28, 1929, there was comparatively little difference in the departmental income. The net income of plaintiff was over $233,000. A so-called "sun room" was installed in the athletic department, which was well patronized, and the rental of sleeping rooms increased.

Upon all of the evidence the court finds as an ultimate fact that the predominant purpose and the activities of the plaintiff are civic, philanthropic, or charitable, and that its main purposes have been those expressed in the object clause of its certificate of incorporation, but that the functions of the club in administering to the social enjoyment, physical well being, and entertainment of its members were not merely incidental to its main purpose, but constituted a very important and material part of its activities and were necessary to its prosperity.

William P. Sidley, of Chicago, Ill. (J. Dwight Dickerson, of Chicago, Ill., on the brief), for plaintiff.

Fred K. Dyar, of Washington, D. C., and Frank J. Wideman, Asst. Atty. Gen., for the United States.

Before BOOTH, Chief Justice, and GREEN, LITTLETON, WILLIAMS, and WHALEY, Judges.

GREEN, Judge:

As the name of the plaintiff indicates, it is a club, and during the period from August 26, 1924, to and including July 23, 1928, paid taxes on dues and initiation fees collected from its members in the amount of $178,916.-24. It now brings suit for this amount with interest, alleging that these taxes were unlawfully collected. The issue in the case is whether the plaintiff was subject to tax as a social or athletic club, the determination of which depends partly upon the construction of the statute imposing taxes on social or athletic clubs and partly upon whether the facts in the case bring it within the proper construction of the statute.

It is insisted on behalf of the plaintiff that the evidence shows that the predominant purpose of the club is not social but civic and philanthropic, and that this fact is sufficient to show that it is exempt from the tax. This contention is in effect that the regulations laid down by the Bureau of Internal Revenue stating under what circumstances a club may be regarded as subject to the tax are not authorized by the statute which imposes it.

We think it is too late now to raise this objection. These regulations were promulgated in 1917 when the statute first went into force. Ever since they have been applied by the courts as laid down and no court has even intimated that they were not authorized under a proper construction of the statute. More than fifteen years have elapsed since the regulations were first announced. During all this period the regulations have remained substantially the same, and Congress, although well aware of the construction which was being placed on the statute by the bureau and by the courts, has several times re-enacted the law imposing the tax. It is well settled that where there has been a long-continued construction of a statute by an executive department charged with its administration which has been approved by the courts, repeated re-enactment of a statute without substantial change may be treated as implied approval of this construction and purpose on the part of Congress to continue the law in force as so construed. The authorities directly or indirectly supporting this rule are so numerous that without citing the decisions we shall hold that the rule applies to the case at bar.

Article 36 of the regulations states: "The tax does not attach to dues or fees * * * merely because it [the club] has incidental social features, but, if the social features are a material purpose of the organization, then it is a 'social * * * club or organization' within the meaning of the act."

This court has taken this regulation for its guidance in all of the cases which come before it and for the reasons stated above we shall continue to apply it as a correct construction of the statute. The effect of its application is to make the decision in the cases which have come before the court turn on the question of whether the social features of the club involved were merely incidental or

whether, on the other hand, they are a material purpose of the organization. This is largely a question of fact although it depends to some extent upon the construction of the word "incidental" as used in the regulations.

We doubt whether there is much to be gained by attempting to define the word "incidental," especially when under some definitions we come back to the original word. For example, one of the dictionary definitions of "incidental" is "casual" and one of the dictionary definitions of "casual" is "incidental." Nevertheless, we think the meaning of the word "incidental" as used in the regulations is well understood and not difficult to apply. An examination of the cases which we have decided will show that in all instances where the social features were few and insignificant, or immaterial to its purposes, as shown by its activities, the social features have been held to be merely incidental and the club not subject to the tax. In cases where it appeared that the club did not conduct, promote, or facilitate any activities of a social nature, or for social purposes, it would seem manifest that the organization could not be held to be a social club and the court so ruled. On the other hand, where the social features were numerous and important to the club and especially where they were necessary to its existence or prosperity, we have uniformly held the club to be taxable as a social club. As often happens, it is possible to cite instances where expressions contained in the opinions of this court detached from the body of the opinion might seem not to be uniform, but when the case as a whole is considered, and especially the facts upon which the judgment was rendered, a consistent application of the rule laid down in the regulations will always be found.

In the Aldine Club Case, 65 Ct. Cl. 315, it appeared that the club was merely a luncheon club and that it carried on no activities in the way of entertainment or recreation. The nearest approach to anything of the kind was some lectures given on instructional topics by distinguished public men. Athletics and sports were entirely ignored. The Bankers' Club Case, 37 F.(2d) 982, 69 Ct. Cl. 121, involved another organization for restaurant purposes having no activities for recreation or entertainment. In neither of these cases were there any activities for purely social purposes. In the Chemists' Club Case, 64 Ct. Cl. 156, and the Cosmos Club Case, 42 F.(2d) 321, 70 Ct. Cl. 366, it was found that the club had some slight facilities for recreation but whatever social features there were were immaterial to and remote from the predominant purpose. In the Washington Club Case, 49 F.(2d) 656, 69 Ct. Cl. 621, it appeared that there were a few social features, but in the opinion, from which one judge dissented, it was said that the social features were clearly incidental and subordinate to the predominant purposes of the club. The Builders' Club Case, 58 F.(2d) 503, 74 Ct. Cl. 595, was another in which it appeared that although the club had some facilities for recreation and places where the members met and conversed with each other it held no meetings and conducted no activities for purely social purposes, and it was held that the social relations were merely incidental to the predominant purpose of the club which was not social. The Houston Club Case, 58 F.(2d) 487, 74 Ct. Cl. 640, was much the same. The club carried on no social activities. The club maintained a dining room but its activities were restricted to the business welfare of the community. It conducted no entertainments nor did it have any meetings for social purposes.

It is also contended on behalf of plaintiff that its corporate character and nature for the purpose of applying the tax must be determined by its predominant or primary purpose, and some cases are cited with reference to altogether different tax provisions which support this view. For example, it is held that in classifying imported articles for the purpose of applying a tariff act the predominant use thereof should determine whether they come within the enumerations of the act. But it will be observed that as respects the taxing act in question this construction is not in accordance with the regulations which, for reasons stated above, we think must be followed. Moreover, in applying customs duties, or as they are sometimes called "tariff taxes," an article must be in one class or the other, otherwise the tax would be in some cases levied twice because the article belonged to two different classes, or it would be in part exempted and in part taxable, which manifestly is not the intention of the law.

It is clear that under the regulations a club may be held to be social for the purposes of the act although its predominant purpose is something else. Or, in other words, a club may be both social and civic or philanthropic.

The decision in the Army & Navy Club Case, 53 F.(2d) 277, 72 Ct. Cl. 684, is criticized because it held in effect that if the social features were an "essential" element of the activities of the club they were not merely "incidental" to its predominant purpose, but the terms "essential" and "incidental" are so

inconsistent in their meaning that we think this criticism is not well founded.

Our conclusion that the social features were a material purpose of the organization is based upon the fact that the club held many dances and other meetings solely for social purposes, that it conducted various kinds of entertainments and sporting contests, had and used elaborate facilities for recreation and entertaining ladies, together with other matters too numerous to set out here, and finally, as said in the case of Fisler v. United States, 66 Ct. Cl. 220, with reference to the social activities of the club: "It is probable that there are few clubs of a purely social nature anywhere in this country that make such elaborate provisions for social enjoyments."

We have not mentioned specifically the luxurious appointments and elaborate facilities of the club which must to some extent have contributed to the enjoyment of its members, for while much stress is laid thereon by counsel for defendant it is not necessary to determine the weight to be given these matters except to say that to some extent they explain and amplify the evidence as to other matters. In order that the argument made on behalf of plaintiff might be fully understood, we have set out in the findings more of the details established by the evidence than is usual and perhaps more than is proper in view of the rule that the decision of the case must depend upon the ultimate fact which, as shown by the findings, is that the social features were not merely incidental but were material, important, and necessary to the prosperity of the club.

Part of the dues which are sought to be recovered back were paid while the club was in its temporary quarters awaiting the construction of the new building. While the club had during this period some facilities for recreation the testimony to which we have referred concerning the social activities of the club pertains to the period after it had occupied its new building. It is not urged on behalf of plaintiff that there should be any separation of dues on this account, probably because the evidence shows clearly the purpose for which the new building was erected, which purpose was formed when the new building was planned and there is no specific date that could be selected for such separation.

The Union League Club of Chicago is a great organization. Its main or predominant purposes are not social but civic, philanthropic, charitable, and highly commendable; but in our opinion it cannot carry on all or nearly all of the social activities of a purely social club which provides social functions in a very extensive manner, without making itself liable to the tax, especially when its social activities constituted such an exceedingly important and material part of the life of the organization.

It follows from what has been stated above the plaintiff's petition must be dismissed, and it is so ordered.