## UNITED STATES v. ANDERSON.
### No. 6896.

Circuit Court of Appeals, Seventh Circuit.

Dec. 18, 1939.

James W. Morris, Asst. Atty. Gen., Sewall Key, Norman D. Keller, and O. W. Hammonds, Sp. Asst. to Atty. Gen., and William J. Campbell, U. S. Atty., of Chicago, Ill., for appellant.

Robert Ash, of Washington, D. C., and Charles S. Deneen and Roy Massena, both of Chicago, Ill., for appellee.

Before SPARKS, TREANOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

In this case the United States imposed a ten percent tax upon certain payments made by Harold S. Anderson (hereafter referred to as "taxpayer" or "appellee") to the receiver, and later to the trustee in bankruptcy, of the Lake Shore Athletic Club, Chicago, Illinois. Appellee paid the tax and filed a refund claim, the Commissioner of Internal Revenue rejected the claim, and the appellee brought this action to recover the tax. Section 501 of the Revenue Act of 1926, as amended by Section 413 of the Revenue Act of 1928, 45 Stat. 864, 26 U.S. C. Secs. 950–952, 26 U.S.C.A. §§ 950–952.

The taxing statute imposes the tax on "any amount paid * * * as dues or membership fees to any social, athletic, or sporting club or organization," and defines the term "dues" as including "any assessment irrespective of the purpose for which made." The District Court found that during the years 1932 through 1936 the property of the Club was operated by the receiver or trustee as a hotel, the payments in question were not paid as an incident of membership, and the payments were made to the receiver or trustee and not to any "club or organization." The Court then concluded that the payments did not constitute club dues, and therefore were not subject to the club dues tax. The United States appealed from the judgment in favor of taxpayer.

The Lake Shore Athletic Club was organized in 1922 as a non-profit corporation for social and athletic purposes. The Board of Directors, empowered to carry out the purposes of the Club, conducted its business, had charge of its property and funds, and controlled its affairs. The Club occupied a seventeen-story club house completely equipped with such facilities as bowling alleys, gymnasium, swimming pool, library, dining room, lounging rooms, bedrooms, ballroom, and roof gardens.

Membership in the Club[1] entitled the member to many privileges. In general these membership privileges consisted of the right to use the club house facilities above mentioned and the right to engage in the activities and affairs of the Club. The right to use the facilities did not in every case include the use thereof without the payment of a separate fee or charge. That is to say, for instance, if a member wished to bowl, sleep or eat at the Club, he was required to pay a fee therefor.

---

[1] According to the by-laws, the membership was divided into 10 classes, namely, Founder, Honorary, Life, Charter, Resident Annual, Associate, Nonresident, Athletic, Army and Navy, Judicial and Diplomatic, and Athletic Founder.

According to the by-laws, some members were required to pay annual dues as an incident of membership; other members were not. In the instant case taxpayer is classified as a Charter member. As to Charter members, the bylaw provided for a 5 years' exemption starting from the opening of the club house in 1927. This means, and the record so reveals, that the taxpayer belonged to the dues-paying group by 1932.

The record also shows that the total dues-paying membership, those subjected to the payment of dues under the by-laws, represented about 50% of the members.

The by-laws provided that if a member was delinquent in the payment of dues, the "Board of Directors may forfeit his membership" or suspend him. A member not in good standing—one delinquent in the payment of dues or other Club accounts—had no right to a vote or a voice in Club meetings, nor was he entitled to use the Club facilities.

However, the enjoyment of many of the membership privileges was not accompanied by separate and additional expense. For instance, the club house was open to the member at his convenience and at all hours of the day, where he could meet with his business associates, use the library and lounging rooms, and enjoy with his family and friends the many comforts of the Club. Too, the Club offered its members such opportunities as belonging on the athletic teams and as enjoying the many social events and activities sponsored solely for the members, their families and guests.

Such was the situation prior to 1931, when the Club operated in the normal manner as a social and athletic club, and its club house facilities were used exclusively by the members and their guests. When operating in the normal manner the Club relied on its membership alone for its income. In general this operating income was derived from two sources: (1) the assessment of dues; and (2) the business in the various departments of the Club (rooms, catering, valet, barber shop, bowling, athletic department, lockers).

The depression came, and as a natural consequence thereof many members resigned, some defaulted in the payment of dues, and most of the remaining members curtailed their patronage of the departmental facilities of the Club. The result was a decrease in operating income, and the Club experienced difficulty in meeting current obligations. In 1931 the Club was placed in state receivership, which continued until 1935, when it sought reorganization under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207.

So we see that from 1932 through 1936 the period in question, the receiver and later the trustee were given the job of conducting the business of the Club. They had been instructed by their respective courts to rehabilitate the physical assets and reorganize the financial affairs of the Club for the benefit of the creditors and of the Club itself.[2] As a consequence thereof, the task devolved upon them, as it formerly had been on the Board of Directors, to balance operating expenses with operating income, and for this purpose they, as formerly had the Board of Directors, received all the income and paid all the expenses of the Club.

It was clear, however, that the Club could not be operated successfully during the lean years on income solely from the membership. The receiver and trustee were compelled to resort to revenues from outsiders. It is to be noted that during this period the income was obtained from two sources: (1) the assessment of occupational charges instead of dues, paid by the members of the Club; and (2) the business in the departments of the Club, patronized by the members and by outsiders.

Occupational charges: On the petition of the receiver a court order, approved by the Board of Directors, was entered in 1931 and made effective for the year 1932, which required the members of the Club (except the honorary, athletic, judicial and diplomatic, and athletic founder classes of membership) to pay to the receiver a monthly "occupational charge" of $10. On August 1, 1933 the charge was reduced to $7.50 a month, and in 1935 with the appointment of the trustee the same assessment policy was carried out.

In addition, a new class of membership —called the "Special" class—was created. These special members were given the same rights as the other members, except as to holding office, and they paid the occupational charge too. The charge was levied only upon members of the Club, was billed to them every month, and was made payable monthly "in lieu of all other charges in the way of dues levied or assessed against such members."[3]

---

[2] By order of the state court the receiver was directed to take possession of the assets of the Club and to "manage and conduct the business now being conducted by the defendant * * * and to continue the operation of the business * * * as an entirety."

By order of the 77B court the trustee was directed to take over the Club assets and to "operate the business of the debtor * * * and to do all things necessary or convenient in the operation of said business."

[3] The following matter is background for the occupational charge and explains the nature thereof. Prior to 1931 dues were payable quarterly in advance. See f. n. 1. In 1932 the assessment policy required a monthly billing to members. The reasons for the change were probably expediency in collection and receivership accounting. In a condensed profit and loss statement for the month of November of 1931 appears this comment: "This loss (of around $3,500), to a large extent, is the result of the fact

Furthermore, delinquent members were subject to exclusion from the use of the Club.[4] It is true that this power to exclude defaulting members was seldom resorted to during the period in question, but it is also true that the charges were obligatory and could have been legally enforcible against non-paying members.[5] As expressed by trustee Marshall Kieg, witness for the taxpayer, if a member delinquent in this respect "is not a good customer, and because of his deportment, or his credit is not so good, we put him out, but if he is well connected and a good spender, we just kind of wink at it and let it ride, in some cases."

Outside Revenues: Prior to 1931 the operating income was obtained solely from the members, and the club house facilities were used exclusively by them. The only change after 1932 was that the use of some facilities, such as the bedrooms, bowling alleys and gymnasium, was shared with non-members. This change meant that after 1932 the operating income of the Club was derived from occupational charges paid by the members in lieu of dues, and from revenues collected from members and outsiders using the various departments of the Club. And such is the state of the record in this case.

*That The Club was in fact not a club.*

In the instant case the bulk of the record stands on documentary and stipulated evidence. The oral evidence adduced at the trial is not conflicting, nor does it present a question of credibility of the storyteller. In fact, in relating the facts herein, we have referred chiefly to the testimony of appellee's only witness; in reality, the testimony of appellant's three witnesses is consistent with his story. So, the facts are not in dispute. The problem is one of construction, one of application of the taxing statute. In such situations, the findings of the trial court, while worthy of great consideration, are not conclusive, cf. Federal Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A. following

---

that dues are not now on a monthly basis and, as a consequence, are not fully reflected in this month's operation." Receiver's Letter to Members, dated December 31, 1931.

In 1932, "all members, who use the Club or who wish to retain the privilege of using the Club, shall pay * * * a service or occupation charge of $10 per month * * * payable monthly, in lieu of all other charges in the way of dues." Board's Letter to Members, dated December 29, 1931. Also stated therein: "If the operation (of the Club by the receiver) were discontinued * * *, any hope for the reorganization of the Club and the preservation of our membership in the Club would be futile."

Stated in the Receiver's Letter to the Members, dated December 21, 1931: "After consulting a large number of influential members representing all classes of membership, and upon several lengthy discussions with your Board of Directors, it was decided that * * * Instead of and in substitution for all other charges in the nature of dues, all * * * Charter * * * members of the Club * * * shall pay * * * a service or occupational charge of $10 per month, payable monthly in advance. * * * This plan was proposed to the Court, who, in approving it, has entered an order. * * * the Board of Directors of the Club, also, has approved this plan. * * *"

4 The receiver was "authorized and ordered to exclude from the use of the Club and the Club facilities, and from the property of the Club all members * * *who shall fail to pay the service or occupational charge. * * *" Order of state court, dated December 24, 1931.

The trustee was "authorized to exclude from said club and forbid the use of said Club or its facilities to any member not paying the occupational or service charge. * * *" Order of 77B court, dated February 1, 1936.

5 The report of the trustee to the Court, dated February 1, 1936, stated that "there are assessed against many members * * * monthly' occupation charges in cases where said member has not for a long period of time used the club or its facilities. These charges are carried as assets upon the books. * * * In some cases suits have been brought by the former Receiver to enforce such monthly occupation charges. * * *"

The trustee then petitioned the Court for authority to compromise and settle the above described suits and accounts in the best interests of every one concerned. He suggested that "it would be far more beneficial to all parties concerned herein to have a former member rejoin the Club than to collect his account in full." By order dated February 21, 1936, the authority requested was granted.

Section 723c; and, where the ultimate finding is a conclusion of law or at least a determination of a mixed question of law and fact, it is subject to judicial review, and on such review the appellate court may substitute its judgment for that of the trial court, Bogardus v. Commissioner, 302 U.S. 34, 39, 58 S.Ct. 61, 82 L.Ed. 32.

On this record the District Court found that the properties of the Club were operated as a hotel. Indirectly the court found that the Club was in fact not a club during the period in question. We can not agree with the District Court. To us, evidence that the members shared their bowling alleys, swimming pool, and bedrooms with non-members does not support the finding that the properties of the Club were operated as a hotel. Surely, such evidence does not support a finding that "the Club was in fact not a club."

As the record clearly shows, nothing was done by the receiver and trustee which unreasonably affected the operation of the various departments of the Club for the convenience of the members. It is true that as to some of the facilities the members had to share them with outsiders. But this arrangement, and it was necessary and temporary in character, did not hamper the social and athletic activities of the Club. In fact, the outside revenues staved off liquidation and made it possible for the members to continue enjoying the many Club activities.

To us it is plain that the receivership and subsequent reorganization proceeding encouraged rather than discouraged Club activities. In this connection significant is the fact that the expenses incurred in the maintenance of Club functions were paid by the receiver and trustee, since they were also receiving its operating income. The Club continued to hold meetings, elected officers and directors, and selected its committees governing various social and athletic events.

For instance, the Club continued to have athletic teams which competed with other amateur teams. It still published "Discus", its magazine, which covered the many functions of the members and their guests. And it regularly held social events for its members and friends, which included Tuesday movies, concerts, parties, Saturday night book reviews, free Sunday bathing, and various other social pastimes. We have no hesitation in concluding that the District Court is clearly erroneous.

*That payment was not made to the Club.*

In the instant case it is a fact that payment was made to the receiver or trustee of the Club. Prior to the receivership payments were made to the treasurer. The conclusion is urged upon us that this difference relieves the taxpayer of liability under the taxing statute. We conclude that this fact, standing alone, does not avoid the tax. Cf. Wild Wing Lodge v. Blacklidge, D.C., 59 F.2d 420, 421; Bunker Hill Country Club v. United States, ct.cl., 9 F.Supp. 52, certiorari denied, 296 U.S. 583, 56 S. Ct. 94, 80 L.Ed. 412; Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 49 S.Ct. 499, 73 L.Ed. 918.

We are satisfied that the statute operates in those cases where the Club's property is held by a receiver, trustee or holding company, legally separate from the Club proper. To permit the conclusion urged upon us is to apply an unreasonably narrow construction of the statute and to invite an easy way to escape the tax. More important to us, and determinative of the issues here, is to ascertain whether the payments in question really constitute club dues.

*Monthly Occupation Charges in lieu of dues.*

In the years before 1932 the customary assessment practice of the Club was to impose dues on an annual basis, and these were payable quarterly in advance. The dues were paid as an incident of membership, and defaulting members suffered various penalties and the forfeiture of membership privileges. The delinquent member was suspended, during which time he had no right to vote or voice in the Club meetings and he was not entitled to use the Club facilities; or he was expelled from the Club, which of course terminated his interest in the properties of the Club.

In 1931 the assessment practice in question was approved by the Board of Directors after consideration thereof by the receiver and the Board. The arrangement was proposed to the court and by order thereof was made effective January 1, 1932. So, starting in 1932, the members of the Club made fixed monthly payments called "occupational charges," which were paid

by them "instead of and in substitution for all other charges in the nature of dues."

We are satisfied that appellee, a Charter member of the Club, paid the charges in lieu of dues and as an incident of Club membership. It is true that many delinquent members, who had defaulted in the payment of dues prior to 1932 and in the payment of the monthly charges after 1932, continued to use the Club facilities. In this case the failure to cancel privileges or to exclude from the use of the Club is not persuasive. The significant fact stands undisputed that the power to cancel or to exclude existed. To us the record convincingly discloses that the charges were obligatory, legally enforcible against nonpaying members, and payable as an incident of membership.

██ We know that the taxing statute in question "was intended to include all payments made in place of dues; that is, all obligatory payments," Garden City Golf Club v. Corwin, 2 Cir., 62 F.2d 246, 248, and that the name by which the payment is called is not controlling, Foran v. McLaughlin, 9 Cir., 59 F.2d 158, 160, certiorari denied, 287 U.S. 637, 53 S.Ct. 87, 77 L.Ed. 552. We conclude, therefore, that in this case the monthly charges paid by the taxpayer in lieu of dues constituted club dues, and hence the taxing statute was applicable.

Reversed.