**James W. KINDELAN and Mary Kindelan, his wife, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 63–167.**

United States District Court
S. D. Florida.

July 9, 1964.

558

Anderson & Nadeau, Miami, Fla., for plaintiffs.

A. C. Murphy, Attorney, Justice Department, Washington, D. C., for United States.

DYER, Chief Judge.

The Taxpayers-Plaintiffs instituted this suit to recover the amount paid by them to the Defendant as excise taxes on sums of money claimed to be dues assessed by the Miami Shores Country Club for the calendar years 1959, 1960 and 1961.

The Country Club is a municipally-owned facility operated by the Recreation Department of the Miami Shores Village, a municipal corporation organized and existing under Chapter 26036, Laws of Florida, 1949. The responsibility for the actual operation of the Club was delegated by the Council to the Village Manager, the day to day operations being conducted by a Club Manager employed by the Village. The latter in turn has his own staff and all of the employees of the Club were employed by the Village.

The Club was established by the Village in 1937 on approximately 121 acres of land. The property was acquired by tax foreclosures, gifts and purchases.

The club house and 18-hole golf course was constructed and financed by WPA grants and the proceeds of mortgages placed on the land.

In 1945 the Village refinanced the whole project by the issuance of general obligation bonds, some of which are still outstanding. Proceeds from the operation of the Club were pledged to the payment of principal and interest on the bonds, and if this was insufficient ad valorem taxes were to be assessed to make up any deficiency. Since 1945 other improvements have been made in the physical facilities of the Club.

At all times the Club has been self-supporting. It has not been necessary to pay expenses of operation from any funds (including ad valorem taxes) other than those derived from the profits of the Club. All improvements have likewise been ultimately paid for from operation profits.

The Council determines the operational procedures of the Club and is responsible for its appropriations, they being part of the Village budget. The monies derived from the Club operation are deposited in a Village bank account and disbursed according to budget authorization. A separate set of books and a separate bank account are used with respect to the operation of the Club. Receipts from the Club are brought forward into the Village budget and disbursements are made only upon checks signed by the Manager or Mayor, or other member of the Council.

The golf course and facilities were open to the general public until 1946, when the Council passed Resolution No. 363, hereinafter referred to, which virtually restricted use to citizens and residents of the Village.

The physical plant of the Club consists of a swimming pool, with administrative, locker and shower facilities; two parking lots of approximately 200 automobile capacity; a club house containing a lobby, administrative offices, dining room, main floor bar, patio room, men's and women's locker rooms, and a men's

bar on the lower floor; an 18-hole golf course, a golf shop separate from the main club house operated by a golf pro containing merchandise for sale, an office and a golf club storage space; and six tennis courts operated by a tennis pro with a small office adjacent thereto.

The club house is the only civic center in the Village. In it are held zoning and other hearings relating to the public affairs of the Village. The club house is used as one of the voting precincts for the holding of Village and State elections.

All of the permanent employees at the club house, swimming pool and golf course are hired and discharged either by the Club Manager, who is an appointee of the Village Manager, or by the latter, and all are paid with Village funds. They are subject to social security and Federal withholding taxes which are collected by the Village. They are members of the Village pension plan (a legislatively authorized measure, Chapter 27740, Laws of Florida, 1951, to which public funds may be contributed). No Florida unemployment tax is paid with respect to such employees.

The Club's lounge and restaurant facilities operate under the same legal provisions as those governing commercial enterprises. The Club is exempt from real and personal property taxes and no Federal income tax is paid on the profits derived from its operations.

No Florida sales tax is imposed or collected on articles purchased by the Village for Club use, such transactions being exempt under Fla.Stats.1963, Ch. 212.08(7), F.S.A.

Because of the rapid population growth of the area which taxed the golf course facilities, the use thereof was restricted by Resolution No. 363 to Village residents and their guests except for annual non-resident members, and fees for the use of the golf course and swimming pool were fixed as follows:

(A) ANNUAL GOLF & POOL

| | |
|---|---|
| Single Village Resident (Freeholder) | $175.00 |
| Family Village Resident (Freeholder) | 200.00 |
| Single Village Resident (Tenant) | 400.00 |
| Family Village Resident (Tenant) | 400.00 |
| Non-Resident members (Single or Family) | 400.00 |

2/16/60

(B) DAILY GOLF

| | | |
|---|---|---|
| Village Resident | (summer–$3.00) | $ 5.00 |
| Guests of Residents or Members | (summer–$5.00) | 7.50 |

(C) ANNUAL POOL

| | |
|---|---|
| Single Village Resident (Freeholder) | $ 40.00 |
| Family Village Resident (Freeholder) | 60.00 |
| Single Village Resident (Tenant) | 60.00 |
| Family Village Resident (Tenant) | 85.00 |
| Single Non-Resident members | 60.00 |
| Family Non-Resident members | 85.00 |

1/ 1/58

(D) DAILY POOL

| | Weekdays | Sat., Sun., Holidays |
|---|---|---|
| Village Residents (Minors) | $ .25 | $ .50 |
| Village Residents (Adults) | .50 | 1.00 |
| Guests of Residents or Members (Children or adults) | .50 | 1.00 |

These annual fees were imposed and collected as a substitute for green fees which were charged for the use of the facility, a reduction being made for lump-sum payment. Theoretically, the charge was imposed on a cost basis, i. e., the amount was designed to provide upkeep and maintenance.

It was possible for a Village resident to use any of the Club's sporting facilities without a specific membership therefor. To do this, he was required to present a Citizen's Social Identification Card to identify himself, or a member of his family, as being a Village resident. He would then pay an additional daily fee for the use of the particular facility, the amount of which would depend on the facility used. The fee for this card was $10.00 per year and was issued only upon application.

All applicants for any type of membership in the Club were required to make out an application form. Freeholders and resident tenants, after being checked by the Membership Committee of the Miami Shores Country Club Association (described more fully hereinafter), were automatically accepted no matter what type of membership was requested. Application for non-residents of the Village required listing of membership in other clubs, bank and personal references, etc. Such applications were passed upon by the same Membership Committee, and if it disapproved the application the applicant was notified of his rejection without reference to the Village Manager. If, however, the Membership Committee found the non-resident applicant acceptable, it was forwarded to the Village Manager who then made the final decision as to acceptability.

The Club had no constitution or by-laws. All rules for its operation were prepared by the Village Manager and approved by the Council.

Miami Shores Country Club Association was a non-profit organization composed of residents and non-residents of the Village who paid annual fees for golf, swimming, or tennis privileges to the Village, its aims being to foster and promote social contacts among its members, and to enjoy, learn and play golf or swimming, and to participate in the other recreational and social activities at the Club and on its premises. All those paying annual fees to the Club are automatically members of the Association. Its bylaws were approved by the Village Council on May 7, 1957.

The Association elects a Board of Committees consisting of a general chairman and chairmen of various operational committees. The members annually elect those who will serve on the Board of Committees for the ensuing year.

In the Association's bylaws it was provided, among other things, that:

"*ARTICLE SEVEN. Section II.* The Board shall control, manage and officiate over all sports and social activities of the Association provided the same are not inconsistent with, or contrary to, the general management and general policies of the Country Club proper. The Board shall have jurisdiction over the conduct, deportment and disciplinary action of the members of this Association."

"*ARTICLE SEVEN. Section V.* The Board, in an advisory capacity only, shall meet with the Village Manager and Council of the Village of Miami Shores in conferences, discussions and meetings of said Council on matters pertaining to the preparation of the Annual Budget for the Country Club and on matters pertaining to the sports, social, financial and other Country Club activities which affect or concern the Association and its members  *  *."

It was also provided that the "Greens Committee" should act in an advisory capacity only as to the upkeep and maintenance of the golf course and make recommendations. It was further charged with promulgating playing rules and

rules governing the conduct of the members of the Association and their guests upon the golf course; the "House Committee" was to act in an advisory capacity only, to make recommendations as to repairs, alterations, maintenance and decoration of the club house, and to promulgate rules concerning the conduct of the members of the Association and their guests on the club house premises. Provision was likewise made for a Tournament, Membership, Women's, Social, Publicity, Swimming and Tennis Committee to carry out the functions usually ascribed to such committees.

The Board of Committees met in regular sessions during the years in issue to discuss subjects relevant to the functioning of the Club within the sphere of the authority granted to it.

The Club published a monthly bulletin entitled "The Country Clubber" which reported, among other items, news of forthcoming social and sporting events and rules of conduct with respect to the use of the Club facilities. Funds for this were authorized by the Village. It was written and supervised by the Club Manager and distributed to annual fee-paying members as well as those holding cards.

There was also an annual booklet published entitled "Miami Shores Country Club—Calendar of Events—Membership Roster" compiled by the Club Secretary and paid for by the Club. Among other items, it contained the names of the members of the Board of Committees, Club supervisory personnel, golf course rules, the scheduling of tournaments, and the names of all annual fee-paying members.

Courtesy privileges were extended to ministers and the members of the Golf Committee who handicapped the Club golfers.

The Treasury Department, in October, 1943, ruled that the Club did not qualify as a social, athletic or sporting club or organization within the meaning of Section 4241 of the Internal Revenue Code, and that the dues and fees paid by the members were not subject to tax.

The Taxpayers-Plaintiffs were Village residents and paid $200.00 per year for each of the years in suit as an annual golf and pool fee. In August, 1962, they paid their liability of the 20% Federal excise tax on the above amounts with interest, pursuant to the determination of the Commissioner of Internal Revenue that the Miami Shores Country Club constituted a "social, athletic, or sporting club or organization" within the meaning of Section 4241(a) (1) of the Internal Revenue Code of 1954, and that the annual fees paid to the Club constituted "dues" which were subject to the 20% Federal excise tax imposed by that section.

After payment of tax and interest amounting to $138.60, the Taxpayers-Plaintiffs filed timely claims for refund, which were disallowed by the Commissioner, and timely instituted the present action for the recovery of the tax so paid.

The controlling question to determine taxability in this case is whether the Miami Shores Country Club constitutes a "club or organization" within the purview of Section 4241(a) (1).

It may be noted at the outset that the tax imposed by this section is not a tax on a club or organization itself, or on property held by such club or organization; rather, it is an excise tax imposed upon the individual's privilege of membership in such a club or organization. Bunker Hill Country Club v. United States, 1934, 9 F.Supp. 52, 80 Ct.Cl. 375; McCaughn v. Williams, 3 Cir., 1928, 23 F.2d 840, Cert. denied, 276 U.S. 629, 48 S.Ct. 322, 72 L.Ed. 740; Multnomah Athletic Club v. Huntley, D.C.Or., 1930, 47 F.2d 352. As such, the tax is paid by the individual (Section 4241(b), Internal Revenue Code of 1954); it is measured in proportion to the cost of the privilege to the individual (20%); and it becomes payable whenever the privilege of membership is exercised by the payment of the required annual dues.

The Miami Shores Country Club was municipally owned and operated. It had no constitution or bylaws. The payment of the fee imposed on golfers and swimmers entitled the payor to no proprietary interest in the Club's property. It was a compensatory assessment based upon use, its object being to maintain the course and pool, together with the income otherwise derived from those that used the Club to operate the entire facility without the necessity of contribution from the Village.

In sum, the Plaintiffs' position is that there were no memberships as such in the Miami Shores Country Club; that the general public of the Miami Shores Village was entitled to the use of the facilities at all times without let or hindrance, subject only to the payment of charges imposed for the use of the particular facilities; that the Club was simply a part of the Recreation Department of the Village under the jurisdiction of the Council; and that its non-exclusionary character established it from a legal standpoint in the same category as a public park or playground.

But this isn't the entire picture by any means. The extensive recreational enterprise with the facilities of the Miami Shores Country Club required attention and management. With the full approval of the Village, The Miami Shores Country Club Association was organized and its bylaws were formerly approved by a Village resolution. The members of the Association were organized in typical club fashion for the purposes of assisting in the operation of the Club by the work of the Board of Committees and Sub-Committees hereinbefore referred to. The purpose of all of this was to provide a private place for social and sporting activities. A cursory look at "The Country Clubber" publication and the physical lay-out of the Club is convincing of this. Not all of the facilities, however, were open equally to all members. Unless annual dues had been paid with respect to the use of a particular facility, its use on a particular day required the payment of an additional fee. Signs were strategically posted that not only was this a private club, but that certain areas were further restricted to particular members (not unlike the distinction between golf and social members in most clubs). Except for the fact that particular facilities were open to those holding a $10.00 annual fee card and who paid a daily instead of an annual fee; that the members had no proprietary interest in the property; and did not run the Club by a Board of Governors elected by the membership, it is difficult to perceive how a member of the Miami Shores Country Club differed in any material respect from members of other private clubs.

The Board of Committees of the Association in their "advisory capacity" effectively functioned as a Board of Governors in all matters except fiscal.

By resolution of the Village Council, only those who held a $10.00 annual fee card were permitted the use of a particular facility by payment of a daily fee. Even if, as contended by the Plaintiffs, the use was permitted by residents not holding such a card, this would not support a finding that the Club was not in fact a club. United States v. Anderson, 7 Cir., 1939, 108 F.2d 475. The annual payments by members were regular and were for the right to repeated and general use of a common club facility for an appreciable period of time; they were not of the isolated and casual character sometimes held not to be dues. Ship Cabin Club, Inc. v. Crenshaw, 4 Cir., 1952, 199 F.2d 594; White v. Winchester Club, 315 U.S. 32, 62 S.Ct. 425, 86 L.Ed. 619.

Lack of the members' proprietary interest in the club property is not determinative. As before noted, the tax imposed by Section 4241 is not a tax on the club itself or on the property held by it. Munn v. Bowers, 2 Cir., 1931, 47 F.2d 204; Bunker Hill Country Club v. United States, supra.

There is no reason for a distinction between a club conducting its activities

on property owned by a municipality or owned privately. While a Club's ownership of property might be considered as a consequence of its existence as a club, it cannot be regarded as a condition to its existence.

Plaintiffs' present reliance upon the Collector's determination letter of October 19, 1943 is of no avail. Now, as contrasted with then, the bylaws of the Association approved by the Village fully cover the various facets of the Club's operation; proposed members must file rather complete applications for membership to be passed upon by a Membership Committee; all members are not entitled to equal club privileges, and there are many rules of the Club in addition to and more extensive than those on the back of the score card. Furthermore, as has been previously pointed out, the members have a very real voice in the management of the affairs of the Club by serving on numerous committees of the Association.

It would serve no useful purpose to belabor this opinion with varying definitions of the word "club" as set forth in dictionaries and decisions, nor to attempt to interpret or distinguish other cases that have grappled with this problem. Necessarily each case involving the question of whether a club is a social, athletic or sporting club or organization within the meaning of Section 4241(a) (1) of the Internal Revenue Code of 1954 must be decided upou its own facts. Downtown Club of Dallas v. United States, 5 Cir., 1957, 240 F.2d 159.

The Miami Shores Country Club was such a club or organization and the dues paid by the Taxpayers-Plaintiffs for membership therein were properly subjected to tax for the years 1959, 1960 and 1961.

This Opinion will serve as the Court's Findings of Fact and Conclusions of Law under Rule 52(a), F.R.Civ.P.

Judgment with costs in favor of the Defendant, United States of America, to be submitted within ten (10) days.