**Albert J. GOULD, Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

**Frank H. RICKETSON, Jr., et al.,
Plaintiffs,**

v.

**UNITED STATES of America,
Defendant.**

**Civ. Nos. 6131, 6491.**

United States District Court
D. Colorado.

Sept. 28, 1960.

Dayton Denious, Denver, Colo., for plaintiffs.

Richard P. Matsch, Tax Atty., Dept. of Justice, and Robert S. Wham, Asst. U. S. Atty., Denver, Colo., for defendant.

KERR, District Judge (assigned).

In these consolidated actions plaintiffs seek to recover from the United States the amounts paid as federal excise taxes allegedly erroneously and illegally assessed and collected from them under Sections 4241 and 4242 of the Internal Revenue Code of 1954, 26 U.S.C. §§ 4241, 4242, Sections 1710 and 1712 of the Internal Revenue Code of 1939, 26 U.S.C. §§ 1710, 1712.

The mixed questions of law and fact are, first, whether the organization known as the "Round-up Riders of the Rockies" is a "social, athletic, or sporting club or organization" as those terms are used in Section 4241(a) (1) of the Internal Revenue Code of 1954, and as they are defined in Sections 101.25 and 101.26, Treasury Regulations 43 (1941 Edition as amended); and, secondly, whether the amounts paid to the "Round-up Riders of the Rockies" constitute "dues" and "initiation fees" under the provisions of Section 4242 of the Internal Revenue Code of 1954 (Section 1712 of the Internal Revenue Code of 1939). The Round-up Riders of the Rockies will hereinafter be referred to as "3 R".

 Section 4241 of the Internal Revenue Code of 1954 imposes a tax on the amount paid as dues to a social, athletic, or sporting club. In Section 4242 of the Code the term "dues" is defined as assessments, irrespective of purpose, and charges for social or sporting privileges or facilities. Congress has not defined the term "social club". The statute has been necessarily extended by Treasury Regulations 43, Sections 101.25 and 101.-26, which contain definitions of the clubs covered by the Code. A social club is defined as one which maintains quarters or arranges periodical dinners or meetings so that the members may congregate for social intercourse. A club is not a social club within the regulations if its social features are not a material purpose, but are subordinate and merely incidental to the active furtherance of a different or predominant purpose. Organizations composed of individuals for the practice or promotion of athletics or sports come within the definition of Athletic or Sporting Clubs.

Jurisdiction of this court is conferred by 28 U.S.C. 1346(a) (1), as amended July 30, 1954, Ch. 648, Section 1, 68 Stat. 589. Prior to the commencement of these actions Plaintiffs satisfied the procedural requirements of filing their claims for tax refunds, which claims were rejected.

The disputed tax was imposed in 1957 in the amount of 20% of the sums paid by plaintiffs to the 3 R in the years 1953–1956, inclusive. The refunds claimed are as follows: Frank H. Ricketson, Jr., $226; Frank J. Johns, $174; William Schweigert, $256; Paul V. Pattridge, $63; Jack R. Munroe, $256; Vergyl H. Reynolds, $244; W. O. Kester, $226; and Albert J. Gould, $226, plus interest in the amount of $4.23.

The 3 R is a corporation organized in 1948 under the laws of Colorado as a non-profit corporation. In its articles of incorporation the declared business and object of the 3 R read as follows:

"(1) To organize, manage and direct horseback rides throughout the Rocky Mountains, to be participated in by members of this corporation and their guests, who shall be select-

ed and invited in accordance with the by-laws of this corporation;"

Plaintiffs contend that it is not a social, athletic, or sporting club and it does not impose dues taxable under the internal revenue laws. They contend that the purpose of the 3 R is to promote interests in the western mountain country which makes Colorado attractive as a vacation land and as a place in which to live. When they organized the essential purpose of the 3 R was to exploit the trails in the Colorado mountains and to advertise the attractive features and resources of Colorado. It is the plaintiffs' contention that their activities are organized and conducted in accordance with their original plan.

Defendant's theory is that the determination of whether a club comes within the taxing statutes and regulations must be made on the basis of what the organization does, and not on what it professes to do. Defendant urges that if any one of the material purposes of the 3 R is social, athletic or sporting, the tax is properly imposed and collected.

There is no dispute but that the inspiration fathering the 3 R was to conduct one spectacular event a year, participated in by a group of civic minded and outstanding citizens of Colorado and of other states. The so-called "Big Ride" consists of a horseback trek between resort towns, along forest trails, with overnight camping. All, ostensibly, to promote tourist trade in the summer resort towns and in the trails and forests in Colorado. The controversy lies in the entertaining features and social aspects of the 3 R during the main ride and the various other rides and other social activities during the year. It is for this court to determine whether the activities of the 3 R are predominantly for the avowed benefit of the state of Colorado or for the interest, entertainment and amusement of the members.

■ The record sustains my deduction and supports my conclusion that the activities of the 3 R are materially and predominantly social, that they are more than incidental components to the development and maintenance of the organization, and that the declared civic or commercial purpose of the 3 R is merely a consequence of such social functions. See Lake of the Forest Club v. United States, 10 Cir., 1943, 137 F.2d 843. I do not agree, however, with the finding by the Commissioner that all the money paid by the plaintiffs is taxable as dues or assessments under the Code.

■ The denominator common to the decisions construing these statutes and regulations is that each case is sui generis. Downtown Club of Dallas v. United States, 5 Cir., 1957, 240 F.2d 159; Tidwell v. Anderson, D.C.S.D.N.Y.1933 4 F.Supp. 789, 791; Rockefeller Center Luncheon Club v. Johnson, D.C.S.D.N.Y. 1955, 131 F.Supp. 703. Nearly every club has some social aspects. Army and Navy Club of America v. United States, Ct.Cl.1931, 53 F.2d 277, certiorari denied 285 U.S. 548, 52 S.Ct. 405, 76 L.Ed. 939. When the Court is required to determine whether or not the social features of a club are dominant or whether they are subordinate and incidental, it must scrutinize the record, weigh the facts and circumstances, and then apply the principles of law.

■ At the outset it is imperative to reiterate the well established rule that neither the recitations in the corporate charter or the by-laws, nor applications for tax exemptions as non-profit organizations, are conclusive as to the character of the organization. Such instruments are merely segments of the evidentiary matter which the court has to consider in addition to the other pertinent evidence. Fleming v. Reinecke, 7 Cir., 1931, 52 F.2d 449; Arkwright Club of City of New York, Inc. v. United States, 1954, 117 F.Supp. 411, 127 Ct.Cl. 247.

The idea of the 3 R was conceived by Frank H. Ricketson, Jr., to acquaint the residents and friends of Colorado and the tourists with the wonders and beauty of the trails and true western atmosphere of the state of Colorado. Though only about half of the incorporators were

horseback riders, the majority of the present members now own their own horses. Riding is a prerequisite to active participation in the club. Membership is select, the general qualifications being that the members be men of public stature, of prestige, horse-lovers, sporting and outdoor enthusiasts, and in sufficient good health to endure the rigors of the annual week-long riding trek in the Colorado mountains.

The record is replete with testimony of the hardships of the ride, of the numerous committees devoting countless hours planning and preparing the trip to make it safe, successful, pleasant and in some respects luxurious. There are convenient accommodations and prearranged entertainment for the ride, purportedly to take the sting out of it. Big name stars perform, the group puts on shows and contests and parades are staged in almost every town. Prizes and trophies are awarded for various and sundry stunts. Despite the inherent hardships of the trails and the mode of locomotion it is apparent to me that the "Big Ride" provides a relaxing vacation for a hand-picked group of businessmen, executives, professional men and ranchers. It is admitted that in the interim before and after the annual trip the social activities are planned to stimulate interest in the organization and to put vitality into it. These interim events include (1) Participation in the Stock Show Ball, attended by the members and their wives. On the Sunday following this dinner dance the 3 R has a party to which they invite their wives, special guests and those who have been helpful to the 3 R; (2) The Easter Parade, composed of from 600 to 1,000 horsemen and women, including members of the 3 R and their wives, after which one of the members serves a brunch for the 3 R and their guests; (3) The Spring Shake-Down or Roundup on which the members ride on the trails and then have lunch with their wives at a ranch to which some of the members have sort of club privileges; (4) The Fall Aspen Ride (sometimes preceded by a Saturday evening

party), which is timed so that the members may enjoy the beautiful colors of the Aspen in the fall; (5) The "Hunter's Dinner" or "Winter Roundup" held in January for the members and their wives to partake of the fruits of the hunting season and to see the motion pictures of the ride of the preceding year; and (6) The dinner at the Denver Dry Goods tea room in the spring, designed to indoctrinate some of the new members and to disseminate information about the forthcoming ride in July. There are other more or less unofficial social events, such as the flight arranged by the United Air Lines over the trails followed by a Dutch-treat dinner, and the spontaneous East-West and West-East rides. In these latter affairs the members of the club who live in the east part of Denver invite those who live in the west side of Denver for a ride and social festivities. This hospitality is reciprocated by those who live or keep their horses in the west side of Denver.

Plaintiffs emphasize the civic purpose of the 3 R with statements that they work in conjunction with the Chamber of Commerce, the mayors of the various towns, and the forest rangers. Such testimony falls short of showing that the 3 R is an adjunct to the Chamber of Commerce, or that there is a common business, professional, or civic interest with the town mayors and forest rangers. See Houston Club v. United States, 1932, 58 F.2d 487, 74 Ct.Cl. 640; Rockefeller Center Luncheon Club v. Johnson, D.C., 131 F.Supp. 703. Though I do not underestimate the quality of the 3 R entertainment as a tourist attraction, I am not convinced of its effectiveness, or influence as an advertising medium for the state of Colorado.

The property owned by the 3 R is sketchy, much of it constitutes donations from the members; some of it is on loan from members. The club owns no club house, no regular meeting place and no permanent camp site. The camp equipment includes folding cots, portable bar, collapsible canvas chairs, tents, coffee urn, gasoline lanterns, a motion picture

**342**

projector and camera, and other accoutrements of camp life. The 3 R owns one panel pick-up truck and a couple of trailers containing toilets and wash basins and showers; other trucks are rented for the trip. The horse equipment includes picket line material, nose bags, buckets, spongers, curry combs and brushes, etc. During the week of the big trek there are on the average of about 25 employees. Some of the employees, known as wranglers (about one wrangler to every ten riders), take general care of the horses, saddle them, curry them, feed and water them, and take care of their equipment. About one camp hand for every twelve riders is necessary to make and break camp, to prepare the morning coffee, and to do the regular camp chores. A masseur, a doctor, and a veterinarian are present on the July ride for the convenience and comfort of the riders and horses.

■ From the numerous cases involving this statute and regulations the following criteria tend to characterize a club as a "social club"; the serving of liquor at club, luncheon and dinner meetings; the participation by ladies in the club's activities and the use by ladies of the club's facilities; the numerous social events used to increase the membership, interest the members, and to support the financial responsibilities of the club; the furnishing of private, attractive, excellent and enjoyable facilities or quarters where members, their families and friends may enjoy congeniality; the appointment of a social or entertainment committee; and the provisions for a convenient and comfortable place where businessmen might meet to converse, eat or drink, relax, read, watch television and the like. Lake of the Forest Club v. United States, 10 Cir., 1943, 137 F.2d 843; Railroad-Machinery Club of New York v. United States, 1951, 95 F.Supp. 822, 118 Ct.Cl. 542; Downtown Club of Dallas v. United States, 5 Cir., 1957, 240 F.2d 159; Turks Head Club v. Broderick, 1 Cir., 1948, 166 F.2d 877; Duquesne Club v. Bell, 3 Cir., 1942, 127 F.2d 363,

143 A.L.R. 1377; Uptown Club of Manhattan, Inc., v. United States, 1949, 83 F.Supp. 823, 113 Ct.Cl. 422; Arkwright Club of City of New York, Inc. v. United States, 1954, 117 F.Supp. 411, 127 Ct.Cl. 247.

■■ On the other hand, the following factual situations support the decisions that the social activities are incidental and subordinate to the predominant non-social purpose of the club; evidence of a predominantly scientific, educational or professional purpose; professional requirements for membership; activities and meetings restricted to the business interests of the community, or to the promotion of business and commerce; where a club house or meeting quarters are restricted to members of a particular industry, whether or not they eat there, and such quarters constitute a clearing house for information concerning that industry. Doctor's Club of Houston, Texas, v. United States, D.C. S.D.Texas, 1960, 183 F.Supp. 152; Houston Club v. United States, 58 F.2d 487, 74 Ct.Cl. 640; Merchants Club v. United States, 66 F.Supp. 126, 128, 106 Ct.Cl. 562. The purpose of the club, or the motives which actuate it, are not necessarily controlling. Army and Navy Club of America v. United States, Ct.Cl.1931, 53 F.2d 277, certiorari denied 285 U.S. 548, 52 S.Ct. 405, 76 L.Ed. 939.

My decision is based on affirmative answers to the following tests: (1) Could the avowed purpose of the 3 R, namely, publicity for the benefit of the state of Colorado, have been accomplished without the numerous social activities of the club members; (2) Despite its altruistic purpose were the existence and survival of the 3 R dependent upon glamour, public attention, exclusiveness, luxury, and entertainment? and (3) Were the club members selected because of their congeniality, prestige, and interest in horses and horsemanship rather than because of their talents and inclinations toward publicity and advertising on a state-wide promotion basis?

Naturally the 3 R attracts a great deal of attention and publicity. It is a very colorful and exclusive organization that has a talent for doing the unusual at times and places where the tourists may be entertained. It goes without saying, however, that the interim social functions have nothing to do with the publicity of the wonders and beauties of the Colorado mountains and trails. The members enjoyed a camaraderie due to economic and social position and interest in the great outdoors and horses, and this relationship evidences the nucleus of a social club within the meaning of the Code.

The tax imposed by Section 4241 of the Internal Revenue Code of 1954 is 20% of the amount paid to a social club as dues, or membership fees, and initiation fees, if the dues or initiation fees exceed $10 per year. The term "dues" is defined in Section 4242 of the Code, as any assessment irrespective of purpose, or any charge for social or sporting privileges or facilities for more than six days. Initiation fees are defined as payments "required as a condition precedent to membership".

█ The rule that the burden of proving a fact erroneous is on the party attacking it is too well established to require more than this passing comment. Plaintiffs have discharged their burden. The evidence demonstrates beyond a doubt that the club requires no initiation fees as a condition precedent to membership. The only fee which vaguely resembles an initiation fee is that paid by the group of men identified as "Cavvies" who have ridden five years and are thereby qualified to be classified as "Riders" whenever a vacancy in that classification occurs. Even the $100 donated to the club by these cavvies is offset at the rate of $25 for expenses incurred in the ensuing four years. I cannot construe the language of Sections 4241 and 4242 to require the taxation of a fee paid by a person, already a member in the club, when he becomes qualified to enter another classification of that club.

The tax assessments were computed on the basis of the total amount paid to the 3 R by the plaintiffs for the years 1953, 1954, 1955 and 1956. The government propounds the theory that the entire amount paid to the organization is taxable because such payments are made for the privilege to participate in the ride and to use the facilities or property of the organization sponsoring it.

Plaintiffs, on the other hand, assert that the total payments are not taxable for the reason that the term "dues" does not include expense charges. The testimony clearly reflects that they never considered that club dues were required of them. There is no evidence that payments are an incident or prerequisite to membership.

At the Directors' meeting in February of each year, a preliminary determination of the fee to be charged for the forthcoming July trek is made, such determination being made upon an educated guess. As a sort of advance registration fee, part of that amount is paid in advance of the ride. If for some reason the member cannot ride and is able to give the Directors sufficient notice of his cancellation, his money may be refunded. If he is not able to give due notice of his inability to ride, and if it is too late to invite a replacement no refund is made. After the trek the expenses are figured and each rider pays his share of any additional expenses on a prorated basis. Letters are written to those who participate in the ride requesting them to make up the balance of the costs of the trip. Obviously the amount paid by the members is flexible, depending upon the expenses incurred each year.

No special assessments are levied against the members for the big ride or for any of the interim functions. To take up the slack in emergencies the club has only a couple of sources of revenue, namely, the camp raffle, the proceeds of the camp store, which has since been abandoned, and the fee paid by the Railsitters or Pioneers (not the Plaintiffs herein), who wish to support the club but who do

not actively participate in the ride. Emergencies arise infrequently and are of the nature of extra expenses for horses or grooms at one of the interim functions of the club. Expenses of the social activities during the year are paid in various ways; either by the hosts of the rides, such as the East-West and West-East rides, or by the host at an affair such as the brunch after the Easter Parade, or by donations such as the gratis airplane ride by the United Air Lines, or by Dutch treats. The cost of the Stock Show Ball is shared by the members who attend it. There is nothing in the evidence to show that these interim social events that are so vital to the existence of the 3 R are paid by club dues or assessments, nor are the costs of such affairs shared by members who do not attend them.

Defendant relies on the case of White v. Winchester Country Club, 1942, 315 U.S. 32, 62 S.Ct. 425, 86 L.Ed. 619, and argues that the payments made by Plaintiffs have the element of repeated and general use of club facilities for an appreciable period of time. Defendant reasons that if a 3 R member fails to participate in a ride for one year he loses his right to continued participation in the group's activities. This statement is not supported by the evidence, nor is it a logical deduction from the White case. The penalty referred to in the White case is imposed for failure to pay the dues and not for failure to participate in the club's functions. See also Ship Cabin Club, Inc. v. Crenshaw, 4 Cir., 1952, 199 F.2d 594; Pendennis Club v. United States, D.C.W.D.Ky.1937, 20 F.Supp. 758.

Not all sums of money paid to a club by a member are taxable as dues and assessments. Garden City Golf Club v. Corwin, 2 Cir., 1932, 62 F.2d 246. It is clear beyond cavil that the payments made by the plaintiffs do not contain the salient features of dues or assessments within the meaning of the statute and are not subject to taxation. Fees are not paid for the operation and maintenance of the club. Plaintiffs' payments reflect an equivalence between the proportion of their contributions and the benefits they receive. White v. Winchester Country Club, supra. For example, a member who does not partake of the big ride, does not pay for that ride, and yet he may participate in the interim activities and pay his share of the expenses therefor. By the same token, there are men who go on the "Big Ride" and pay for their expenses while on it who do not attend or pay for any one of the other club functions. Secondly, payments by the plaintiffs to the club are not determined on an annual or other regular periodic basis. They are of an isolated nature, depending upon participation in club functions and the expenses incurred therein. White v. Winchester Country Club, supra; Knoll Golf Club v. United States, D.C.N.J.1959, 179 F.Supp. 377; Ship Cabin, Inc. v. Crenshaw, supra.

For the foregoing reasons, plaintiffs' claim for refund of the taxes assessed and paid was improperly disallowed by the Commissioner of Internal Revenue and plaintiffs may have judgment for the sums unlawfully collected, together with interest and costs.

The facts herein stated and the conclusions of law herein expressed shall be considered the Findings of Fact and the Conclusions of Law required by Rule 52, F.R.Civ.P., 28 U.S.C. Plaintiffs will submit judgment in accordance with this memorandum within twenty (20) days from this date and the Clerk will enter an order accordingly.