Frank SHAW, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 21237.

United States District Court
E. D. Michigan, S. D.

April 12, 1963.

Roger N. Jackson, Wyandotte, Mich., for plaintiff.

Lawrence Gubow, U. S. Atty., Robert F. Ritzenhein, Asst. U. S. Atty., Detroit, Mich., Louis F. Oberdorfer, Asst. Atty. Gen., Edward S. Smith, David A. Wilson, Jr., Solomon Fisher, Attys., Dept. of Justice, Washington, D. C., for defendant.

MACHROWICZ, District Judge.

Plaintiff, "on behalf of himself and all others similarly situated," brought suit against the United States of America, R. I. Nixon, District Director of Internal Revenue Service, John Orlick, also known as Jack Orlick, doing business as West Shore Golf and Country Club, and William Stadler. By stipulation, the action was dismissed as to John Orlick, also known as Jack Orlick, doing business as West Shore Golf and Country Club and William L. Stadler, also as to R. I. Nixon, District Director of Internal Revenue. The "unnamed plaintiffs" alleged in the plaintiffs' complaint were also dismissed as parties to the action, leaving Frank Shaw as sole plaintiff and United States of America as sole defendant. The amended complaint sought an adjudication and decree that the excise taxes and interest paid by plaintiff to the defendant on dues paid to the so-called West Shore Golf and Country Club be declared to have been illegally, erroneously and excessively collected and they be refunded to plaintiff with costs and interest.

Defendant denied the allegation that the excise taxes were collected illegally, erroneously or excessively. Testimony was taken on the facts in dispute and exhibits received in support thereof.

FINDINGS OF FACT

1. Frank Shaw (hereinafter referred to as the taxpayer) was a member of the West Shore Golf and Country Club during the period June, 1952 through June, 1956, inclusive.

2. On April 29, 1960, there was assessed against the taxpayer a deficiency in tax of One Hundred Two and no/100 Dollars, ($102.00) and a deficiency in interest of Thirty-three and 30/100 Dollars, ($33.30) based upon the dues paid by him to the Club during the period June, 1952 through June, 1956, inclusive.

3. On May 5, 1960, the taxpayer paid to the Government One Hundred Thirty-five and 50/100 Dollars, ($135.50).

4. The taxpayer filed a claim for refund of One Hundred Thirty-five and 30/100 Dollars, ($135.30) on June 15, 1960.

5. The Club maintains an eighteen-hole golf course, a putting green, a dining area, a kitchen, a club room, a shower, a washroom area, a men's locker room, a ladies' locker room, and a pro-shop. (Tr. 222; Ex. Q).

6. The By-laws of the Club provide for a Board of Directors of members responsible for the management of the Club, to hold office "for the respective term for which they are elected," but no provision was made for the method of election (Pltff. Ex. 2, Art. III, Tr. 87). The operation of the Club including the question of membership was delegated by the Board largely to Jack Orlick, the golf professional and manager, subject to the Board's supervision (Tr. 290).

7. The By-laws provided for "honorary memberships" to be elected annually by the Board (Pltff. Ex. 2), but no such elections were formally held (Tr. 256, 257, 324), and some of the Board members paid no dues but were considered "honorary members". (Tr. 60, 61, 255).

8. The Club had three classes of membership. One was a family membership,

the second was a single membership, the third was honorary membership. (Pltff. Ex. 2, Art. I; Tr. 32, 195–196, 418–419).

9. The members joined the Club for the prime purpose to use the golf course, also for the purpose of social intercourse. (Tr. 34, 306, 334, 336–337, 380–381, 412–413, 423, 431, 440, 444, 457, 464). Some members joined because of the advantage of a private course over a public course. (Tr. 34, 412, 440).

10. The amount of dues paid did not vary or depend upon the number of times the Club's facilities were used during the course of a year. (Tr. 301, 314–315, 418, 433, 438–439). Additional sums were charged in some cases for social functions. (Tr. 269, 270).

11. Members and guests were required to register before using the golf course. (Tr. 18–19, 185, 300, 334, 376, 413, 431–432, 459–460).

12. From time to time, in accordance with the common practice of golf clubs, the Club's facilities were leased for affairs sponsored by members. (Tr. 188).

13. In accordance with the usual practice of golf clubs, members of clubs in other sections of the country were afforded the privilege or favor of using the Club's facilities when in the area. (Tr. 216).

14. In accordance with the usual practice of golf clubs, members were allowed to sign for bills at the Grosse Isle Golf Club, which were paid for by the Club who was reimbursed by the member. (Tr. 312, 330–331).

15. The use of the golf course and other Club facilities was, as a rule, limited to members and guests. (Tr. 8, 36–37, 300–301, 376, 407, 411, 419, 439, 450, 467). Signs on the Club premises so indicated. (Tr. 35–36, 191–193, 331–332, 395, 408, 420–421, 432, 450, 458, 467, 475; Govt. Exs. B1–B5, M).

16. The Club has a club liquor license which is issued only to bona fide private non-profit clubs. (Tr. 107, 184–185; Govt. Exs. K1, K2).

17. The Club is located in an area, the zoning laws of which permit only bona fide non-profit clubs. (Tr. 393–396; Govt. Ex. U).

18. The Club is not owned by any individual. The land and buildings in which the Club is located are owned by Mr. and Mrs. William Stadler (Tr. 59, 60). Membership is not transferable (Tr. 264).

19. The profits of the Club, if any, do not inure to the benefit of any individual, but Mr. and Mrs. William Stadler receive rent determined from profits at the end of each year. The rental agreement requires the Club to pay a fair rental (Tr. 104–107). There is no evidence that any amounts were paid to or on behalf of Mr. and Mrs. Stadler which exceeded a fair rental.

20. Separate insurance policies were maintained to protect the separate interests of the Stadlers, Mr. Orlick, and the Club. (Tr. 184).

21. Separate books, bank accounts, and bills were kept for the Club and for the pro-shop concession operated by Mr. Orlick (Tr. 99, 101, 211–212; Govt. Exs. R, S).

22. The Club and the pro-shop maintained separate tax account numbers with both the state and federal government. (Tr. 202–208; Govt. Exs. J1, J2, J3, 01–04, E–I).

23. The Club has membership applications. (Tr. 382–383, 423–425, 459; Govt. Ex. A). Membership was not limited to a specific number of persons (Tr. 78, 79, 327). Application forms were not always filled out. Mr. Orlick usually passed on the applications and the qualifications were that the applicant was "reasonably well-dressed and well-mannered". (Tr. 77, 78, 79 and 322).

24. The Club has membership cards which are furnished to its members. (Pltff. Ex. 5; Tr. 47, 83–84, 441, 459).

25. Public utility records are maintained in the name of the Club. (Tr. 373–374, 473).

26. In accordance with the common practice of golf clubs, the Club made arrangements for the use of its facilities by various leagues. The purpose of this

was to provide the Club with additional income on its slow days. (Tr. 43–44, 109, 185–187, 299). Members are entitled to play even on league days. (Tr. 43–44).

27. The Club had various committees, though they did not all function regularly. (Tr. 66, 68–69, 182). The members of these committees served voluntarily and without pay. (Tr. 218–219, 423). They were usually appointed by Orlick. (Tr. 67, 68, 69, 427).

28. The entertainment committee presented a full social program for the members. (Tr. 197–198, 390–391, 423–433; Govt. Ex. N).

29. The Club furnished some funds to the entertainment committee (Tr. 91–92, 230–234, 410–413; Govt. Ex. C). The entertainment committee raised additional funds from charges made for some Club functions and maintained its own bank account. (Tr. 72, 92–93, Govt. Ex. L).

30. From time to time the entertainment committee with its funds purchased for the Club patio furniture, a block barbeque pit and a speaker system. (Tr. 91–93, 422–423; Govt. Exs. 01–02).

31. The Club ran many different tournaments for its members only and gave awards to the winners at the annual banquet dinner. (Tr. 21, 43, 47, 213–214, 219, 303, 334, 381–382, 452, 460).

32. Copies of the alleged By-laws were never posted in or about the Club (Tr. 62, 81, 82). The Board of Directors did not attempt to circulate the By-laws to the members (Tr. 81, 82, 287, 323). Most members of the Club were not aware of the existence of said By-laws, nor could they recall having seen or been furnished with a copy of them. (Tr. 8, 344, 384, 416, 426, 435, 443, 453, 463).

33. With the possible exception of 1952, no formal general or special meeting of the Club membership was held, (Tr. 81, 286, 319–320, 384, 415, 435, 453, 462), nor were they notified of such a meeting.

34. Many members were totally unaware of who the officers and directors were. (Tr. 17, 18, 245, 383, 384, 415, 425, 435, 442, 453, 462). Dues were increased without a vote of the members. (Tr. 79, 386, 416, 426, 436, 442, 454, 462).

## CONCLUSIONS OF LAW

■■■ Even though the evidence discloses that the Club was run in a very informal manner, that the By-laws were not strictly adhered to, and that the members seemed more interested in the golfing and social activities than in the management of the business affairs of the Club, nevertheless, despite the technical objections of the plaintiff to the informal way of handling the Club's business, he has failed to meet the burden of proof, which rests upon him to prove, that this was not a bonafide club, New Colonial Ice Co. v. Helvering, 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348; Treasury Regulations on Excise Tax (1954 Code), Section 49.4241(e)(1); Treasury Regulations 43 (1941 ed.) (1939 Code) Sec. 101.24; Detroit Osteopathic Hospital v. Johnson, 290 Mich. 283, 287 N.W. 466. Neither does the existence of a landlord preclude an organization from being a Club. Scott v. United States, 6 Cir., 300 F.2d 141.

Even if the plaintiff had succeeded in showing that the West Shore is not a social, athletic or sporting club, it still is a social, athletic or sporting organization, as that term is defined. Treasury Regulations on Excise Tax (1954 Code), Sec. 49.4241–(e)(2); Treasury Regulations 43 (1941 edition) (1939 Code), Sec. 101.-25.

Section 49.4241–1(e)(3) of the Treasury Regulations on Excise Tax (1954 Code) provides:

"Tennis, golf, boxing, boating, canoe, fishing, and hunting clubs, and all other organizations organized for the practice or promotion of athletics or sports are athletic or sporting clubs or organizations within the meaning of the regulations in this part."

■■■ Since it is not disputed that the primary purpose of the membership dues

was to pay for the use of the Club's golf course facilities, it is clear that this is the type of organization dealt with in the statute. Though the statute provides for certain exemptions from the tax, there is no provision which would exclude profit-making organizations or organizations that are operated informally. It would therefore appear that Congress did not intend to exclude this type of organization from the tax, or it would have specifically said so.

 The situation in this case is very similar to the one presented to the Court in the case of Bunker Hill Country Club v. United States, 9 F.Supp. 52, 80 Ct.Cl. 375, where the Court pointed out that the tax is not on the Club but rather on the privilege of belonging. It is imposed on the member and is a tax on the privilege to share in the facilities available to members, and not a tax on the property. Multnomah Athletic Club v. Huntley, 9 Cir., 47 F.2d 352. The statute not only uses the term "club", but also the term "organization", which indicates an intent of Congress to widen the scope of the definition. Various facts alleged in the present case, such as one-man control, failure to comply with special rules and regulations, were also present in that case, but the Court held the tax applicable, the significant fact being that the members joined for the common purpose of using the facilities of the Club.

The fact that the Club facilities were not limited to Club members does not change the members' liability for the tax. United States v. Anderson, 7 Cir., 108 F.2d 475.

## CONCLUSION

As the plaintiff has failed to sustain the burden of proof that the West Shore Golf and Country Club is not a club within the meaning of the statute, or in the alternative that it is not an organization within the meaning of the statute,

It is hereby ordered and adjudged

That plaintiff's amended complaint be dismissed with prejudice, and with costs to be assessed.