A. S. EPSTEIN

v.

The UNITED STATES.

No. 20–63.

United States Court of Claims.

March 18, 1966.

an opinion and report filed on October 30, 1964. The plaintiff has excepted to the opinion and certain of the findings of fact. The parties have filed briefs and the case has been argued orally. Since the court agrees with the commissioner's findings, his opinion and his recommended conclusions of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. This result is in accord with and is supported by the recent decision of the 9th Circuit in United States v. Howe, 349 F.2d 483 (1965). Plaintiff is therefore not entitled to recover and the petition is dismissed.

OPINION OF COMMISSIONER

Plaintiff, an individual who was owner and operator of the "Club Del Mar" in Santa Monica, California, sues to recover excise taxes which he paid on monthly membership dues and members' annual locker rental charges for the period from January 1, 1959 to October 31, 1960. Such taxes were assessed under section 4241(a) (1) of the Internal Revenue Code of 1954 which imposes: "A tax equivalent to 20 percent of any amount paid as dues [1] or membership fees to any social, athletic, or sporting club or organization, if the dues or fees of an active resident annual member are in excess of $10 per year." [2] The principal issues as stipulated by the parties are (1) whether the Club Del Mar was a club or organization within the meaning of the section; (2) if so, whether it was a "social, athletic, or sporting club or organization"; and (3) whether, in any event, refund is barred by section 6415 of the Code.[3]

George T. Altman, Beverly Hills, Cal., attorney of record, for plaintiff.

Philip R. Miller, Washington, D. C., with whom was Acting Asst. Atty. Gen., C. Moxley Featherston, for defendant. Lyle M. Turner and Joseph P. Spellman, Washington, D. C., of counsel.

Before COWEN, Chief Judge, WHITAKER, Senior Judge, and LARAMORE, DAVIS, and COLLINS, Judges.

PER CURIAM:

This case was referred pursuant to former Rule 45(a) (now Rule 57(a)) to Trial Commissioner Herbert N. Maletz with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in

1. Section 4242(a) defines the term "dues" to include "any assessment, irrespective of the purpose for which made, and any charges for social privileges or facilities, or for golf, tennis, polo, swimming, or other athletic or sporting privileges or facilities, for any period of more than six days * * *."

2. Pursuant to sections 4241(b) and 4291, the taxes imposed by the sections are required to be paid by the member to the club or organization which, in turn, is obligated to pay such taxes over to the Government.

3. That section provides in part that "refund of any overpayment of tax imposed by section * * * 4241 * * * may be allowed to the person who collected the tax and paid it to the Secretary * * * if such person establishes, under such regulations as the Secretary * * * may prescribe, that he has repaid the amount of such tax to the person from whom he collected it, or obtains the consent of such person to the allowance of such * * * refund."

The Club Del Mar was built in 1926 and was acquired by plaintiff in 1958. The property consisted of a main building of six stories, bearing in front the title "Del Mar Hotel and Club", and an adjacent private beach fronting on the Pacific Ocean. On the lobby floor (which was the third floor of the building) were a hotel registration desk, a hotel office, a reception desk, a gift counter and shop, a club office, a large club lounge, two banquet rooms, a large ballroom which also served as a restaurant, and another restaurant and bar overlooking the ocean. On the fourth floor was another banquet room. On the remainder of the fourth floor and on the fifth and sixth floors were hotel rooms numbering 120 in all.

On the second floor of the building (i. e., the floor below the lobby), there was a laundry and ladies' locker rooms. The floor below that (which was the ground floor from the beach side) had a large Olympic-size indoor swimming pool; men's locker rooms; a men's and a women's gymnasium each containing various kinds of apparatus used for physical exercise and conditioning; storage area; and a beauty shop and barber shop. The swimming pool had a balcony which was part of the second floor.

The private beach, which was connected to the main building by an underpass running beneath a public way, was bounded by fences along two boundaries and by a cafeteria and paddle tennis court fences along the third. The remaining boundary of the beach was unfenced and bordered on a public beach belonging to the State. Signs reading "Club Del Mar" were placed along the open line of the club beach and efforts were made to keep members of the general public out therefrom. Club facilities on the beach consisted of the cafeteria, a restaurant, volleyball and paddle tennis courts, and a children's playground.

The facilities of the Club Del Mar were not open or held out as open to the general public except for the beauty shop and barber shop which had entrances both on the street and inside the premises. Concessionaires operated these shops and had instructions to restrict their outside trade from entering into the other areas of the property. In the event an outside customer desired to go into such areas, the concessionaire was required to call a membership salesman to take him through.

As a further means of controlling access to the club's premises, persons coming into the lobby from the street were stopped and asked to indicate why they were there. However, the club's facilities were not limited to club members and their guests. Any person could rent a hotel room (a 10% discount therefor being granted to members) and by doing so have, during the period of his stay, the use of all the facilities and beach on the same basis as members. Further, anyone, whether a member of the club or not, could arrange for the use of various of the club's facilities for luncheons, cocktail parties, wedding receptions, fashion shows, charity benefits, business affairs, etc. Those putting on such functions could invite anyone they wished, whether members or not, and once on the premises those attending such affairs could go anywhere they pleased in the facility, although as a practical matter the beach facilities were used mainly by club members and hotel guests. At least one-third of the food and beverage business in the facility came from banquets and affairs given by outside organizations, while the other two-thirds of that business was obtained from members, members' guests, hotel guests and guests of hotel guests.

Various services in the club were provided by concessionaires, which services included (in addition to those provided by the beauty and barber shops) dancing, bridge and swimming lessons, and massages. One did not have to be a club member to obtain these services; however, most concessionaire customers (other than those using the beauty and barber shops) were, in fact, either club members or persons who would very soon become such. In the event a member of the general public came into the lobby from the front entrance for purpose of

obtaining the services of a concessionaire, he would be directed to that concessionaire and at the same time solicited to become a member of the club. In the time a concessionaire's customer was on the club's premises, he could have the run of its facilities.

During the period in issue, the Club Del Mar engaged in an extensive membership campaign consisting, among other things, of newspaper advertisements and mail-outs, which included copies of the club magazine "Club Del Mar Life" and membership application blanks. The promotional literature, as well as the application blanks, represented that the Club Del Mar was an all-year family beach club with recreational and social activities for the whole family and possessing the following features: the most beautiful private beach in the world; health facilities; men's and ladies' gyms; steam rooms; Olympic-heated pool; tennis courts; children's playground; recreation; dinner dancing Friday, Saturday and Sunday with name bands; teenage parties; bridge and dance lessons; and excellent food at modest prices. In addition, thousands of folders were mailed out with a courtesy guest card attached to each entitling the bearer and his party to one day's use of facilities on the same basis as a member. Other persons were also allowed to use the club's facilities on a trial basis for a day, although such persons were encouraged to obtain a guest card. Plaintiff, however, discouraged anyone from using the private beach and other athletic and health facilities on a day-by-day basis for a fee.

As part of the promotional effort, some ten to twenty salesmen were employed to solicit club memberships. This they did by analyzing the family's needs, pointing out the facilities such as beach, gymnasium, etc., which were available for each member of the family, and indicating that the club had dinner dancing, fashion shows, etc. New members were also obtained through current members by offering the latter cash incentives, free tickets to an honor roll ball, and prizes for those who brought in the most members, such as trips to Hawaii, television sets, etc.

For purpose of promoting the hotel business, plaintiff also distributed a brochure to travel agencies throughout the country. The brochure entitled "The Del Mar Hotel and Restaurant" gave the same address as the Club Del Mar and contained a detailed description of the hotel and club premises, including the gymnasium and beach.

During the pertinent period the initiation fee for a family membership was $100.00 for all but several months, while the monthly dues were $12.00, which dues were the same regardless of the number of times the facilities were used. Some advertisements stated that the monthly dues were $12.00 including tax; other advertisements stated that the monthly dues were $10.00 plus tax. The membership application blanks stated that monthly dues were $12.00 "including federal tax" or which "includes federal taxes". In addition to the monthly dues, members using the swimming pool or beach were required to use a club locker for which (during most of the relevant period) there was an annual rental charge of $24.00. The club's "Locker Room Rules" (which were contained in the by-laws) specified in this connection that the "Members' annual locker fees * * * are $20.00 annually plus tax." The monthly dues and the annual locker rental were accounted for on the club's books as follows (as plaintiff was aware): (1) of the $12.00 dues, $10.00 was allocated to club dues income and $2.00 to excise tax liability; (2) of the $24.00 locker fee, $20.00 was allocated to locker rental income and $4.00 to excise tax liability. The bills sent to members for dues or locker fees never contained a separate charge for taxes, nor otherwise referred to taxes; they referred to the full amount billed as dues, or locker fees, as the case might be. The same was true of the ledger account of each member.

In the years here relevant, the Club Del Mar had as many as 1,000 dues-paying members and a membership turnover

of one-fourth to one-third a year. It also had some 500 courtesy or "C" members, consisting of persons who, plaintiff felt, could be of promotional assistance to the club's business. "C" members paid no dues, but rather were billed only for food and other day-to-day items they purchased at the club. It was the plaintiff's objective to have a closed membership—which he estimated would require from 2,500 to 3,000 members—so as to provide a profitable operation and prevent the continuous expenditures for acquisition of new members.

One applying for membership had to fill out the membership application blank which, among other things, required him to give social and financial references. The latter references were checked to determine the extent of credit the applicant would be allowed at the club's facilities. Credit was also granted to persons who were not members but who might be the source of hotel, banquet or restaurant business in the facility. In addition, credit cards were issued to persons who were good customers of the restaurant or bar but did not want to become club members; such cards were not, however, issued to persons who wanted them merely to use the club's beach, pool or gym. While a credit card was good on its face only for rooms, restaurant and bar, there was nothing to stop a holder once on the premises from using all the club's facilities, although there is no evidence that such holders actually used the beach, pool or gym to any significant extent.

The membership application blank which the applicant was required to sign specified that if he were accepted as a member he agreed to abide by the club's by-laws. On becoming a member the applicant received a copy of the by-laws and the club's rules and regulations, together with a letter of acceptance signed by "T. D. Harter, President" stating in part that it was hoped the member would participate in the club's "many social and recreational activities." The by-laws provided that the objectives of the Club Del Mar were "To maintain, conduct and operate an exclusive family club in the best social traditions; also to develop a community spirit, goodwill, sociability and friendship among and to promote the physical and social welfare of its members and their families and guests." The by-laws also provided that "members shall not be personally liable for any debt or financial obligation of the Club"; that "Membership does not entitle members to any voting rights"; that the Membership Committee shall be appointed by the Board of Directors or owners"; that the "Membership Committee shall have the full authority to act on applications for membership"; that its "actions shall be considered final subject only to review by the Board of Directors or owners"; and that it "shall have the power to cancel and terminate any Membership at any time and for any reason that it may deem proper."

Although the by-laws, application blanks and advertisements referred to T. D. Harter as president, to the membership committee and to the Board of Directors, in actuality, Harter was an employee of plaintiff, there was no membership committee, and there was no Board of Directors. Instead, plaintiff alone approved membership applications and it was he who in effect was the membership committee. None of the members had any authority in the operation of the property, nor any right of approval or other control in respect of the applications for membership. Plaintiff's checks were signed by him or his executive director and from time to time the club literature included the name of plaintiff as "owner". Plaintiff alone fixed the entrance fees, due and locker fees, and his purpose in operating the club was to make a profit. However, during the years in issue plaintiff incurred losses in the operation of the club and hotel, and such losses were borne by him, not by the members. Nor did the members bear any of the expenses incurred in the operation of the facilities. Plaintiff did not deal in any respect with any group of members; rather, his relation was directly with each member separately. The members had no organiza-

tion of any kind or any committees; nor did they get together in any meeting, as members.

The Club Del Mar had frequent social events, such as parties on Halloween, Thanksgiving, Christmas and New Year's; dinner dancing on Fridays, Saturdays and Sundays; luaus; family dinners; fashion shows; etc. The functions were announced in a magazine entitled "Club Del Mar Life" which the club issued periodically and sent to members and also to prospective members. On occasion, too, some of the club's social events were listed in a brochure sent to members, prospective members, hotel guests and business houses. Those attending club parties were usually members, members' friends, and persons connected with the same business concerns as members. If a member of the general public came into the club to attend a party, he would be asked how he happened to come in; if he was presentable, he would be allowed to enter, and at the same time his name and address would be taken on the assumption that he would be a prospect for membership. The dinner dances given by the club on Friday, Saturday and Sunday evenings were not, except for a period of some three months in 1959, open to the public or advertised as such.

Free movies were given at the club on Saturday afternoons for club members and prospective members and their children. Also, considerable attention was given to other activities for children of members. Thus the club held teenage dance parties, a children's Easter party, and children's competition of various kinds, including paddle tennis and volleyball tournaments, and pool and ocean swimming events.

The club sponsored athletic competitions between its members on the Fourth of July, Labor Day and other holidays. These competitions, which were limited to members, included paddle tennis, volleyball and shuffleboard tournaments, and swimming races in the pool and ocean for children. A person who had been designated as the club's athletic director assisted the members in forming teams for the swimming events; he also organized a club swimming team which represented the club in various competitions with other teams.

The Club Del Mar had affiliation arrangements with some 38 other clubs which provided for reciprocal visitors' privileges for their respective members, and in accordance with such arrangements, it issued visitors' cards to various of its members enabling them to visit affiliated clubs.

Plaintiff filed excise tax returns for December 1958 and the first quarter of 1959, but not thereafter until visited by a revenue agent in August 1960. As a result of, and on the day of this visit, plaintiff wrote to the Internal Revenue Service giving various reasons- for his failure to file such returns. In December 1960, plaintiff filed a club dues tax return covering the period from January 1, 1959 through October 31, 1960, in the amount of $70,076.06, which "tax" (he stated) "has been collected by me from members of the Club Del Mar." He enclosed a check for $2,500 and suggested an installment method for paying the remainder. Following the filing of liens against plaintiff, the total tax assessment was paid for which (except for a portion barred by limitations) recovery is sought here.

The first problem, against this background, is to determine whether the Club Del Mar was a "club or organization" within the meaning of the section. While there is no statutory definition of these terms, it would seem they envisage an association or a substantial commingling of a defined group of individuals for a common purpose or objective. Bunker Hill Country Club v. United States, 9 F.Supp. 52, 56, 80 Ct.Cl. 375, 384 (1934), cert. denied 296 U.S. 583, 56 S.Ct. 94, 80 L.Ed. 412 (1935); Chattanooga Automobile Club v. Commissioner, 182 F.2d 551, 554 (6th Cir., 1950); Arner v. Rogan, 27 AFTR 1092, 1095 (S.D.Cal., 1940). See also G.C.M. 23688, 1943–Cum.Bull. 283, 286; Rev.Rul. 58–589,

1958–2 Cum.Bull. 266, 267. Whether these features are present or not depends not on the instrumentality's name but on its purposes and actual operations. Neither the corporate charter nor the by-laws are decisive in this connection; they are merely part of the evidence which must be considered in conjunction with all other pertinent factors. See e. g., Cosmos Club v. United States, 42 F.2d 321, 70 Ct.Cl. 366 (1930); Union League Club of Chicago v. United States, 4 F.Supp. 929, 78 Ct.Cl. 351 (1933); Town Club of St. Louis v. United States, 68 F.2d 620 (8th Cir., 1934); Century Club v. United States, 12 F.Supp. 617, 81 Ct.Cl. 878 (1935); Furniture Club of America v. United States, 67 F.Supp. 764 (N.D.Ill., 1946); Arkwright Club of City of New York v. United States, 117 F.Supp. 411, 127 Ct.Cl. 247 (1954); Gould v. United States, 187 F.Supp. 337, 340 (D.Colo., 1960). In this light, the evidence as a whole leads to these conclusions: the Club Del Mar's members were afforded opportunity to associate together for the common purpose of using and enjoying the club's facilities and participating in its social, recreational and athletic activities; there was substantial commingling among members in these respects; the members made themselves subject to rules and regulations in their conduct and use of the club's facilities; they could use the club's facilities for as many or as few times as they wished for an initiation fee, prescribed monthly dues and annual locker rentals; and they composed a group distinct and apart from the general public in these various respects. Bunker Hill Country Club v. United States, supra, 9 F.Supp. 52, 80 Ct.Cl. p. 384. See also Rev.Rul. 63–3, 1963–1 Cum. Bull. 258, 259.

It is true that the Club Del Mar's facilities were not limited to members, but this in itself does not change the members' liability for the tax,[4] it being sufficient that the facilities were not open, without limit, to the general public. United States v. Anderson, 108 F.2d 475, 479 (7th Cir., 1939); Shaw v. United States, 253 F.Supp. 703 (E.D.Mich., 1963).

Plaintiff maintains, however, that the dues tax is applicable only to non-profit clubs or organizations (i. e., membership-owned, controlled and financed) of the kind exempt from income tax by section 501(c) (7) of the 1954 Code.[5] However, the principle is established in this court that the dues tax applies equally to profit and non-profit clubs or organizations, and irrespective

4. The dues tax is an excise tax imposed upon a payment made "for the right to repeated and general use of a common club facility for an appreciable period of time * * *" White v. Winchester Country Club, 315 U.S. 32, 41, 62 S.Ct. 425, 430, 86 L.Ed. 619 (1942). See also Congressional Country Club v. United States, 44 F.2d 266, 71 Ct.Cl. 161 (1930). Since the term "dues" is defined by the Code to include "any charges for social privileges or facilities * * * for more than six days", amounts paid for locker rental are included. Knoll Golf Club v. United States, 179 F.Supp. 377 (D.N.J., 1959); Cohan v. United States, 198 F.Supp. 591 (E.D.Mich., 1961); Hoke v. United States, 215 F.Supp. 942 (S.D.W.Va., 1963).

5. That section exempts from income tax "Clubs organized and operated exclusively for pleasure, recreation, and other non-profitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder." Under a 1943 Internal Revenue Service ruling, the term "clubs" as used in a predecessor section was deemed to be used in the same sense as the term "club" in the dues tax section so that to constitute a "club" " * * * at least there must be some sort of association or cooperation between the members in an effort to reach some common objective before we may consider that there is a club or organization * * *" G.C.M., 23688, 1943–Cum.Bull. 283, 286–87. Under a later ruling, a non-profit club exempt from income tax was considered to be "a social, athletic, or sporting club or organization" for purposes of the excise tax on dues. Rev.Rul. 56–334, 1956–2 Cum.Bull. 831. It, of course, does not follow from these rulings that membership dues in a club subject to income tax are *ipso facto* exempt from the dues tax. See Engineers' Club of Los Angeles v. United States, 173 F. Supp. 934, 936 (S.D.Cal., 1959).

of whether or not the members have property rights in the organization or bear liability for assessment. Bunker Hill Country Club v. United States, supra. To similar effect the court stated in Shaw v. United States, supra (p. 707 of 253 F. Supp.): "Though the Statute provides for certain exemptions from the tax, there is no provision which would exclude profit-making organizations or organizations that are operated informally. It would therefore appear that Congress did not intend to exclude this type of organization from the tax, or it would have specifically said so." [6] Likewise, it has been the published position of the Internal Revenue Service since 1925 that the applicability of the tax is not affected by the fact that the club or organization is operated for profit or that the member making the payment may not participate in the management. See S.T. 457, 1925–1 Cum.Bull. 296 and its recent reaffirmance in Rev.Rul. 63–3, 1963–1 Cum. Bull. 258. The Service's "substantially contemporaneous expressions of opinion are highly relevant and material evidence of the probable general understanding of the times and of the opinions of men who probably were active in the drafting of the statute." White v. Winchester Country Club, 315 U.S. at 41, 62 S.Ct. at 430.[7]

From the foregoing, the necessary conclusion is that the Club Del Mar was a "club or organization" within the meaning of the dues tax section of the Code. But this, of course, does not end the inquiry inasmuch as the dues tax is imposed only if the club or organization is a "social, athletic, or sporting" one. Many cases in this court make it clear that to constitute a club or organization of this nature, the social, athletic or sporting activities must represent an important and material part of the organization's operations and not be merely

---

6. In *Shaw* the facility was largely operated by a single individual who, among other things, usually passed on applications for membership and appointed members of various committees, all of which committees did not function regularly. No formal general or special membership meetings were held and the members had no voice in the dues. The court held that despite the fact that the club was run in a very informal manner, that the by-laws were not strictly adhered to, and that the members were primarily interested in the golfing and social activities, plaintiff had failed to meet the burden of proof of showing that it was not a bona fide club.

7. In 1958 and 1959 legislation was adopted adding as section 4243(b) of the Code a provision exempting any amount paid as dues or membership fees or as initiation fees for the construction or reconstruction of any social, athletic or sporting facility or capital addition or improvement thereto. 72 Stat. 1288; 73 Stat. 618. The legislative history of these enactments indicates they were not intended to be applicable to "charges which go to the upkeep and operation of social, athletic or sporting clubs" and such charges "continue to be taxable." See 1958–3 Cum. Bull. 372, 412, 584, 627–28. Another modification in 1959 was to limit the exemption to sums actually expended within three years after payment by the member, the unexpended balance to be subject to the tax upon the expiration of that period, the tax payable on such unexpended balance by "the club or organization, rather than the person who made such payment * * *." Plaintiff argues that when Congress exempted all payments by the members earmarked for capital additions and improvements and continued taxability of charges which go to upkeep and operation, the assumption was necessary that the clubs within the scope of the tax were member-financed on the basis that it would make no sense to say that payments by members are for capital additions which they could not own or control. But there is nothing in the statute or in the legislative history to indicate that in adopting these amendments Congress intended any departure from the long-standing principle that the dues tax was applicable to profit as well as non-profit clubs or organizations. It may be noted in passing that as of December 1960 the Club Del Mar's bills to members specifically stipulated that the amount paid thereon "will be used in its entirety to repay loans and reimburse reserve funds used for construction, furnishings, etc., pursuant to section 4243 of the Internal Revenue Code, until such repayment and reimbursement is complete."

incidental to its other activities.[8] Consistent with this, the Treasury regulations provide in part:[9]

(e) *Social, athletic, or sporting club or organization*—(1) *In general.* The purposes and activities of a club or organization, and not its name, determine its character for purposes of the tax. Every club or organization which has a membership of individuals or family units and which has social, athletic, or sporting features is presumed to be a social, athletic, or sporting club or organization, until the club or organization has satisfied the district director that it is not in fact a social, athletic, or sporting club or organization within the meaning of the regulations in this part. * * *

(2) *Social clubs or organizations.* Any club or organization which maintains quarters, or arranges periodic dinners or meetings, for the purpose of affording its members an opportunity of congregating for social intercourse is a social club or organization within the meaning of the regulations in this part, unless its social features are not a material purpose of the organization, but are subordinate and merely incidental to the active furtherance of a different and predominant purpose, such as religion, the arts, or business. * * *

■ Here the record demonstrates that social activities of the Club Del Mar, such as dances, parties, family dinners, fashion shows, athletic competitions, etc., were a prominent and material feature of its activities. What is more, such social activities not only tended to make membership therein more desirable, they were also used for, and were of substantial assistance in, attracting new members. See Army & Navy Club of America v. United States, 53 F.2d 277, 282, 72 Ct.Cl. 684, 693 (1931); Chicago Engineers' Club v. United States, 9 F.Supp. 680, 683, 80 Ct.Cl. 615, 621 (1935); Transportation Club of San Francisco v. United States, 17 F.Supp. 201, 84 Ct.Cl. 253 (1936). From these considerations, I am persuaded that the Club Del Mar was a "social, athletic, or sporting club or organization" within the meaning of section 4241(a).

Urging a contrary result, plaintiff places considerable reliance on Howe v. United States, 226 F.Supp. 566 (S.D. Cal., 1964) and Arner v. Rogan, 27 AFTR 1092 (S.D.Cal., 1940). *Howe* involved the taxability of sums paid to the Balboa Bay Club for rental of a boat slip. The court found the following: The club was a profit-making venture, having facilities which included rooms and apartments, dining rooms, a cocktail lounge, and tennis courts; club membership carried no interest in the plant; there were no general meetings; members were not consulted on policy; and there was only one committee of members which planned a monthly party. Admission of new members was controlled by the club manager so that any person dropping out lost his investment; there was no provision for transfer of membership. Out-

8. E. g., Chemists' Club v. United States, 64 Ct.Cl. 156 (1927); Army & Navy Club of America v. United States, 53 F.2d 277, 72 Ct.Cl. 684 (1931), cert. denied, 285 U.S. 548, 52 S.Ct. 405, 76 L.Ed. 939 (1932); Houston Club v. United States, 58 F.2d 487, 74 Ct.Cl. 640 (1932); Union League Club of Chicago v. United States, 4 F.Supp. 929, 78 Ct.Cl. 351 (1933); University Club, City of Washington v. United States, 6 F.Supp. 129, 79 Ct.Cl. 780 (1934); Whitehall Lunch Club v. United States, 9 F.Supp. 132, 80 Ct.Cl. 350 (1934); Chicago Engineers' Club v. United States, 9 F.Supp. 680, 80 Ct.Cl. 615 (1935); Century Club v. United States, 12 F.Supp. 617, 81 Ct.Cl. 878 (1935); Transportation Club of San Francisco v. United States, 17 F.Supp. 201, 84 Ct.Cl. 253 (1936); Merchants Club of America v. United States, 66 F. Supp. 126, 106 Ct.Cl. 562 (1946); Bankers Club v. United States, 87 F.Supp. 253, 115 Ct.Cl. 50 (1949); Drug & Chemical Club of New York v. United States, 115 Ct.Cl. 66 (1949), cert. denied 340 U.S. 810, 71 S.Ct. 37, 95 L.Ed. 595 (1950); Railroad-Machinery Club of New York v. United States, 95 F.Supp. 822, 118 Ct.Cl. 542 (1951).

9. Treasury Regulations on Excise Taxes (1954 Code) § 49.4241–1.

side groups sometimes used the club facilities, which arrangements were made without consulting the members. Rooms and apartments were sometimes rented to nonmembers who were then permitted to use the club facilities. A beauty shop and a dress shop on the premises were open to the public. The club rented boat docks to individual members on a monthly basis, the amount in each case being based on the size of the slip rented. The court held on the basis of these facts that the Balboa Club was an organization in outward form only; that it had assumed the indicia of a club without giving members customary privileges and responsibility; and that actually it was not a club or organization at all but rather a resort hotel operated for a profit. From these facts, the case appears to be distinguishable from the present one in several major respects. For one thing, unlike the present case, it did not appear that the members were associated together for the common purpose of enjoying whatever social, athletic and sporting facilities were offered by the club, or that there was substantial commingling among members in the use and enjoyment of such facilities. Nor did it appear that a material and important part of the club's activities was devoted to the usual and customary events characteristic of a social, athletic or sporting club, such as dances, parties, outdoor athletic competitions, and the like.

*Arner* v. *Rogan* involved the issue as to whether an establishment called the Biltmore Health Club was within the purview of the dues tax section. The club's facilities consisted of steam baths, showers, massages, ultraviolet treatments, several small rowing machines, stationary bicycles, and a small swimming pool. There was never any competition in the pool or instruction in swimming and, in the ordinary routine, the pool was simply one step in the control of body temperature and light muscular exercise. There were no sports practices which constituted a material part of the club's activities; the members never met together or in committee, and never participated in any activities which are normally carried on by members of clubs or similar organizations. From this it was concluded that the facility did not constitute a club or organization within the meaning of the dues tax provision. The facts in the present case are obviously quite different since here the members not only participated in the Club Del Mar's numerous social events and athletic competitions, such activities comprised major features of the organization.

■ The third issue presented by the parties is whether, even assuming the Club Del Mar was not within the purview of the dues tax provision, refund is barred by section 6415 of the Code. That section (as previously noted) permits a collector of a tax to seek recovery upon proof that he has repaid the amount of such tax to the person from whom he collected it, or has obtained the consent of such person to the allowance of the refund. Plaintiff does not allege, and the evidence does not show, that he, either individually or in his capacity of doing business as Club Del Mar, has made a refund to the club members or has obtained the consent of the members to the allowance of the refund sought in this suit. In such circumstances, recovery may be had only if plaintiff can show that he himself had borne the economic burden of the taxes by paying them out of his own pocket and had not collected them from members.[10] See e. g., Gumpert v. United States, 296 F.2d 927, 155 Ct.Cl. 721 (1961); McGowan v. United States, 296 F.2d 252 (5th Cir., 1961); United States v. Walker, 234 F.2d 910 (5th Cir., 1956). Whether or not plaintiff bore the economic burden is a factual question. Worth-

---

10. No infringement of due process is involved in this restriction. "If the taxpayer has borne the burden of the tax, he readily can show it; and certainly there is nothing arbitrary in requiring that he make such a showing. If he has shifted the burden to the purchasers, they and not he have been the actual sufferers and are the real parties in interest * * *." United States v. Jefferson Electric Co., 291 U.S. 386, 402, 54 S.Ct. 443, 449, 78 L.Ed. 859 (1934).

ington Pump & Machinery Corp. v. United States, 122 F.Supp. 843, 847, 129 Ct. Cl. 87, 93 (1954).

 As to this the evidence shows: In advertising for new members, plaintiff variously expressed the amount of monthly dues a member would be liable for as $10.00 per month plus tax or $12.00 per month including tax. The application blanks for membership used during the period in issue stated that monthly dues were $12.00 "including federal tax" or "which includes federal taxes." During most of the relevant period, the annual locker rental charged members was $24.00, the "Locker Room Rules" specifying in this connection that the "Members' annual locker fees * * * are $20.00 annually plus tax." [11] In view of these circumstances, it would not seem of moment that the bills sent members for dues or locker fees never contained a separate charge for taxes or otherwise referred to taxes, but rather referred to the full amount billed as dues or locker fees. There is the further consideration that on the books of the Club Del Mar the monthly dues and annual locker fees were accounted for as follows: of the $12.00 dues, $10.00 was allocated to club dues income and $2.00 to excise tax liability; of the $24.00 locker fee, $20.00 was allocated to locker rental income and $4.00 to excise tax liability. Also, when plaintiff in December 1960 filed a dues tax return covering the period from January 1, 1959 through October 31, 1960, he stated in an accompanying letter to the Internal Revenue Service that the "tax has been collected by me from the members of the Club Del Mar." See Bunker Hill Country Club v. United States, supra, 9 F.Supp. 52, 80 Ct.Cl. p. 385; Smith v. United States, 242 F.2d 486, 487 (5th Cir., 1957). Plaintiff argues, however, that he suffered considerable losses during the period in question and that this shows he must have paid the taxes out of his own pocket. But given the circumstances present here, this hardly seems determinative. See Worthington Pump & Ma-

chinery Corp. v. United States, supra, 122 F.Supp. 843, 129 Ct.Cl. p. 93. For the other considerations mentioned above compel the conclusion that plaintiff has failed to show that he bore the economic burden of the taxes; indeed such considerations demonstrate that he, in fact, collected the taxes from the members. So in passing it might be observed that had plaintiff not collected the taxes from the members, but instead paid them from his own pocket, his losses would have been that much greater.

In conclusion, since the record shows that the Club Del Mar was a "social, athletic, or sporting club or organization" within the meaning of the dues tax provision and since, in any event, plaintiff has failed to prove that he bore the economic burden of the taxes in question, I am of the opinion that the petition should be dismissed.

---

11. Up to the end of June 1959 the annual rental fee for a locker was $20.00 rather than $24.00.